985 A.2d 915

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Kareem JOHNSON, Appellant.**

Supreme Court of Pennsylvania.

Argued April 15, 2009.

Decided Dec. 29, 2009.

---

Michael Coard, for Kareem Johnson.

Amy Zapp, PA Office of Attorney General, Harrisburg, Hugh J. Burns, Jr., Philadelphia District Attorney's Office, Philadelphia, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice McCAFFERY.

On December 15, 2002, Appellant and at least one other person shot Walter Smith to death on the street in front of a bar in North Philadelphia. Some three months before his violent death, Mr. Smith had told police that an acquaintance of Appellant's, Clinton Robinson, was responsible for the August 2002 murder of another person, Margaret Thomas. Appellant was arrested in May 2006, for the murder of Mr. Smith. The Commonwealth's theory of the case was that Appellant had killed Mr. Smith in order to prevent him from testifying against Mr. Robinson. The Commonwealth relied upon physical evidence that included the following: 1) two different types of ammunition recovered from the murder scene as well as from Mr. Smith's body, showing that Appellant had acted in concert with at least one other individual in the murder; and 2) a red baseball-type cap found at the scene that contained Appellant's DNA on the sweatband and Mr. Smith's DNA in blood stains on the brim. In addition, the Commonwealth presented the testimony of Bryant Younger, who had heard Appellant make two statements with which he implicated himself in Mr. Smith's murder. The defense sought to cast doubt upon the Commonwealth's evidence largely by challenging the significance of the DNA evidence and by characterizing Mr. Younger as a "rat" who would do anything to avoid an impending life sentence for a federal drug conviction.

Appellant was convicted by a jury in June 2007, of first-degree murder, criminal conspiracy, and possession of an instrument of crime. Appellant was sentenced to death after the jury found that any mitigating circumstances were outweighed by the aggravating circumstance that Appellant had a significant history of felony convictions involving the use of violence to the person.[1] 42 Pa.C.S. § 9711(d)(9). Appellant

---

1. In March 2006, Appellant had been convicted of the first-degree murder of a 10–year old child who was shot while on his way to school and of aggravated assault upon the crossing guard at the school, who was also shot. Neither of these individuals was an intended victim of

was also sentenced to a concurrent term of 20 to 40 years' imprisonment on the conspiracy conviction. Appellant now appeals his judgment of sentence to this Court and raises six guilt phase issues and one penalty phase issue. We affirm both the convictions and the penalty imposed.

The specific guilt phase issues raised by Appellant are as follows:

1. Did the Commonwealth, as a matter of law, fail to prove beyond a reasonable doubt that Appellant engaged in a conspiracy to commit first-degree murder?

2. Did the Commonwealth, as a matter of law, fail to prove beyond a reasonable doubt that Appellant committed first-degree murder?

3. Did the trial judge commit reversible error and thereby deny Appellant a fair trial by allowing unduly prejudicial testimony?

4. Did the trial judge a second time commit reversible error and thereby deny Appellant a fair trial by allowing unduly prejudicial testimony?

5. Did the jury give undue weight to the insufficient DNA evidence presented by the Commonwealth?

6. Did the jury give undue weight to the incredible testimony of a Commonwealth witness who had a *crimen falsi* record?

The penalty phase issue raised by Appellant is the following:

Did the jury unreasonably fail to find any mitigating factors, including Appellant's age, which was merely a few months past his 18th birthday?

Appellant or the group of men of which he was a part. Appellant was sentenced to life in prison for the murder and an aggregate consecutive term of 23½ to 47 years' imprisonment for the aggravated assault and related offenses. That judgment of sentence was affirmed by the Superior Court on October 18, 2007, and this Court subsequently denied a petition for allowance of appeal. *Commonwealth v. Johnson,* 943 A.2d 315 (Pa.Super.2007) (Table), *appeal denied,* 597 Pa. 728, 952 A.2d 675 (2008). We note that Appellant declined the opportunity to plead guilty to the instant charges in return for imposition of a life sentence concurrent to the one he was already serving.

In Appellant's first two issues, he contends that the evidence was insufficient to sustain his convictions for conspiracy to commit homicide or for first-degree murder. Specifically, he asserts that there was insufficient evidence of an agreement to sustain his conspiracy conviction and insufficient evidence of an intentional, willful, deliberate, and premeditated killing to sustain his first-degree murder conviction. *See* Appellant's Brief at 7–8. In all death penalty direct appeals, whether or not the appellant specifically raises the issue, this Court reviews the evidence to ensure that it is sufficient to support the conviction of first-degree murder. *Commonwealth v. Blakeney,* 596 Pa. 510, 946 A.2d 645, 651 n. 3 (2008). In this case, we will consider concurrently the sufficiency of the evidence to sustain both Appellant's first-degree murder conviction and his conspiracy conviction. *See Commonwealth v. Montalvo,* 598 Pa. 263, 956 A.2d 926, 931–32 (2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1989, 173 L.Ed.2d 1091 (2009) (in a capital case, concurrently addressing sufficiency challenges to the appellant's first-degree murder conviction and his conspiracy conviction).

Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. An intentional killing is a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body.

*Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 68 (2008) (citations and quotation marks omitted).

To prove conspiracy, "the trier of fact must find that: 1) the defendant intended to commit or aid in the commission of the criminal act; 2) the defendant entered into an agreement with another to engage in the crime; and 3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Montalvo, supra* at 932 (citation omitted). In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by "the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." *Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580, 592 (1998); *see also Commonwealth v. Murphy,* 577 Pa. 275, 844 A.2d 1228, 1238 (2004) (quoting *Spotz* ). In the case of a conspiracy to commit homicide, each member of the conspiracy "can be convicted of first-degree murder regardless of who inflicted the fatal wound." *Montalvo, supra* at 932.

In reviewing a sufficiency challenge, we must evaluate the entire trial record and consider all the evidence received. *Baumhammers, supra* at 68. Furthermore, the trier of fact, in passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence. *Id.*

We have reviewed in detail the notes of testimony from Appellant's trial in order to determine if the evidence was sufficient to establish the elements of first-degree murder as well as conspiracy. We conclude that it was, based on the following testimony by the Commonwealth's witnesses.

Edwin Lieberman, M.D., a forensic pathologist and an assistant medical examiner at the Philadelphia morgue, supervised the autopsy of Mr. Smith and co-signed the autopsy report. Notes of Testimony ("N.T."), 6/21/07, at 11, 17–18. He testified that Mr. Smith was the victim of a homicide and that the cause of his death was multiple gunshot wounds. *Id.* at 42. More specifically, Mr. Smith had sustained twelve gunshot wounds, including three to his head; one each to his back, the lower part of his face, his buttocks, and his abdomen;

and several to various extremities. *Id.* at 24, 28–37. Two of the three gunshot wounds to Mr. Smith's head caused injury to his brain and were incapacitating;[2] one of the incapacitating head injuries resulted from a shot to his forehead, fired at close range, *i.e.*, 6 inches to 2½ feet. *Id.* at 28–32. Mr. Smith also sustained an incapacitating gunshot wound to his spinal cord. *Id.* at 33–34. Dr. Lieberman concluded that two of the three incapacitating gunshots were fired after Mr. Smith had fallen to the ground, in an already incapacitated state from his injuries. *Id.* at 33–34, 40.

Deborah Williams, a friend of Mr. Smith's who was with him on the night of his murder, testified that they had just left a bar and were walking toward their vehicle when a man wearing red clothing and a baseball cap brushed past her and walked in front of the vehicle, toward Mr. Smith. N.T., 6/20/07, at 176–77, 181–83.[3] She heard several gunshots ring out, and ducked down on the passenger's side of the vehicle. *Id.* at 166–67. She then saw a couple of people running away, including the man who had brushed past her, and she realized that Mr. Smith had been shot and was lying on the ground on the driver's side of the vehicle. *Id.* at 168–69, 177. She further noted a red hat at the scene. *Id.* at 168.

Officer William Trenwith, a police officer who aided in the investigation of the crime scene, testified that he recovered a red NBA insignia baseball cap approximately 8 to 10 feet from the victim's body. *Id.* at 116, 129. The officer noted that there were small drops of blood, apparently fresh, underneath the brim of the hat. *Id.* at 116. However, significantly, there

2. Dr. Lieberman explained that an "incapacitating" injury is one that puts the victim on the ground because he or she has been rendered incapable of walking or standing or even moving voluntarily. N.T., 6/21/07, at 31. Dr. Lieberman also explained that he was unable to determine the order in which Mr. Smith's gunshot wounds were sustained. *Id.* at 24–25.

3. In her statement to police on the night of the murder, Ms. Williams was asked what the man who brushed past her was wearing and she responded as follows: "I recall seeing red. He wasn't wearing heavy clothing. It was more like a sweat suit. And he had a hat on, it was a baseball cap." N.T., 6/20/07, at 183, 226. At trial, she testified that she had told police that the individual was wearing a *red* hat. *Id.* at 181, 183.

was no spattered blood in the vicinity of where the hat was recovered; rather, spattered blood was observed only on the vehicle next to where Mr. Smith had fallen after being shot. *Id.* at 123. The officer testified that, in his experience, he had never observed blood from a gunshot victim spatter as far from the body as the hat was found from the victim in this case. *Id.* In addition, Officer Trenwith testified as to the nature and the specific location of the ballistics evidence that he recovered from the crime scene; this evidence included nine fired cartridge cases as well as projectile, *i.e.*, bullet, fragments. *Id.* at 127, 131, 133.

Officer Robert Stott, an expert in firearms and ballistics evidence who served in the Philadelphia Police Firearms Identification Unit, testified as to his analysis of the firearms-related evidence recovered from the scene of the murder. N.T., 6/21/07, at 47, 50–51. Officer Stott concluded that all nine cartridge cases recovered from the scene were fired from the same firearm. *Id.* at 61, 80. However, based on his analysis of the projectile fragments recovered both from the scene and from Mr. Smith's body, Officer Stott concluded that at least two different firearms, at least one of which was a revolver-type firearm, were used in the shooting. *Id.* at 73, 79, 81.

Detective James Burns, the homicide detective assigned to investigate Mr. Smith's murder, testified that in the fall of 2005, which was nearly three years after the murder, he became aware from another detective that one Bryant Younger, who was then under indictment for federal narcotics offenses, had information relative to the crime. N.T., 6/20/07, at 211, 239. Detective Burns interviewed Mr. Younger, and then sought and was granted a warrant to take a blood sample from Appellant for purposes of comparing his DNA to that found on evidence from the murder scene. *Id.* at 240, 246.

Laurie Wisniewski, a forensic scientist in the DNA Identification Lab of the Philadelphia Police Department, testified as to her analysis of samples extracted from the hat that had been recovered from the murder scene. N.T., 6/21/07, at 140,143, 159. She concluded that the DNA from the blood-

stain on the hat was that of Mr. Smith, the murder victim. *Id.* at 160–62. Furthermore, she concluded that the DNA extracted from a sweat stain on the sweatband of the hat originated from two persons, with the major contributor being Appellant.[4] *Id.* at 162–67.

Mr. Younger, who at the time of Appellant's trial was serving a ten-year federal sentence for distribution of drugs, testified as to two conversations he had overheard in which Appellant had implicated himself in Mr. Smith's murder. *Id.* at 88. Mr. Younger acknowledged that he told police about these conversations in order to obtain a reduction in his life sentence for federal drug offenses. *Id.* at 96–100. The first overheard conversation, which took place in the neighborhood approximately a week after the murder, was between Appellant and one Kennell Spady. *Id.* at 92. Mr. Spady stated to Appellant, "I heard you put that work in" at a bar. *Id.* In response, Appellant stated that he went in the bar, was going to "pop" the victim there, but decided to wait until the victim came out and then "handled his business." *Id.* at 93. Appellant and Mr. Spady then began making motions with their hands as if they were shooting guns, meanwhile also making sounds to mimic gunshots. *Id.* at 93–95. In the second conversation, Mr. Younger overheard Appellant tell Clinton Robinson, who was in custody following his arrest for the homicide of Margaret Thomas, "If it wasn't for me, your ass wouldn't be going home." *Id.* at 95.

Detective John Cummings, a Philadelphia homicide detective who had investigated the August 2002 murder of Margaret Thomas, testified that Mr. Smith had identified Clinton Robinson as the perpetrator of the Thomas murder. *Id.* at 44–46. In addition, Detective Cummings testified that Deborah Williams, as well as Mr. Smith, had been present at the scene of Ms. Thomas's murder, and that Mr. Smith had also been shot at that time. *Id.* at 44–45.

4. Ms. Wisniewski also testified that the frequency in the random unrelated population of the DNA profiles identified for Mr. Smith and Appellant was between one in 11.1 quintillion and one in 50.7 quintillion. N.T., 6/21/07, at 161, 164. A quintillion is $1 \times 10^{18}$. *Id.* at 165.

Detective James Burke, a detective in the Fugitive Unit of the Philadelphia Police Department, testified that in October 2002, he was assigned to find Clinton Robinson, who at that time was a fugitive wanted in connection with Ms. Thomas's murder. *Id.* at 83–84. On February 21, 2003, Detective Burke went to 2849 North Taney Street in Philadelphia, where he located Mr. Robinson. *Id.* at 85. Six days later, the detective returned to the same address, and this time "c[a]me in contact" with Appellant. *Id.* at 85–86.

Based on the testimony of all these witnesses, we conclude that the evidence and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, were sufficient to establish that Appellant is guilty of first-degree murder and conspiracy in the death of Walter Smith. The testimony of Dr. Lieberman established that Mr. Smith was the victim of a homicide who died of multiple gunshot wounds. The Commonwealth offered ample circumstantial evidence to establish that Appellant was responsible for Mr. Smith's murder, including the following. (1) A red baseball hat found at the murder scene near the victim's body contained Appellant's DNA on the sweatband and Mr. Smith's DNA in a bloodstain on the brim. Mr. Smith's companion on the night of his murder testified that someone wearing red clothing and a baseball cap ran past her just before the shooting started, and then, following the shooting, that person, among others, ran from the scene. No spattered blood was observed near where the cap was found. The Commonwealth suggested, and the jury could have reasonably inferred, that Appellant had been wearing the hat when he shot Mr. Smith at close range, staining the brim of the hat with Mr. Smith's spattered blood, but then Appellant lost the hat when he ran from the scene. (2) There was testimony concerning two conversations in which Appellant implicated himself in the murder. In the first conversation, Appellant acknowledged that he had shot someone outside a bar. In the second conversation, Appellant indicated that he had done something to get Clinton Robinson released from

custody after the latter was arrested for the murder of Ms. Thomas. (3) There was evidence that Appellant knew Mr. Robinson, whom Mr. Smith had identified to police as Ms. Thomas's killer. The Commonwealth reasonably suggested that Appellant's motivation in killing Mr. Smith was to prevent him from testifying against Mr. Robinson. Finally, there was ample evidence that Mr. Smith's murder was intentional, willful, deliberate, and premeditated. Dr. Lieberman testified that Mr. Smith sustained three incapacitating injuries from three gunshots, two of which injuries were to his head, and two of which shots were fired after Mr. Smith had fallen to the ground, already in an incapacitated state. Furthermore, Dr. Lieberman also testified that one of Mr. Smith's incapacitating injuries was caused by a bullet fired directly into his forehead at close range. Dr. Lieberman's testimony was unquestionably sufficient to establish that the intent of the shooters was to kill Mr. Smith. We conclude that the Commonwealth established all three elements of first-degree murder.

With regard to his conspiracy conviction, Appellant insists that the evidence was insufficient to establish the existence of an agreement between co-conspirators to kill Mr. Smith. We do not agree. In most cases of conspiracy, the element of agreement is established not by direct evidence, but by circumstantial evidence. *Spotz*, 716 A.2d at 592; *Murphy*, 844 A.2d at 1238. Here, the evidence established that at least two assailants suddenly converged on Mr. Smith as he was approaching his vehicle, and, with at least two firearms, shot him twelve times in numerous parts of his body, from his head and neck to his trunk and his extremities. It strains credulity to imagine that two armed assailants independently materialized, at precisely the same time and the same place and with the same intent, *i.e.*, to gun-down Mr. Smith. The ballistics evidence indicated that bullets fired from two different firearms were found lodged in Mr. Smith's neck. *See* N.T., 6/21/07, at 78. The conduct and the overt acts of the shooters constituted sufficient evidence from which the jury could reasonably infer the existence of a conspiratorial agreement.

Just as we concluded that there was sufficient evidence to establish that Appellant was guilty of the first-degree murder of Mr. Smith, we further conclude that there was also sufficient evidence to establish that Appellant was guilty of conspiracy to commit murder. Accordingly, Appellant's first two issues have no merit.

Appellant's third and fourth issues are challenges to evidentiary rulings by the trial court. Before considering those issues, we are compelled to point out that, while a person convicted of a crime is guaranteed the right to direct appeal under Article V, Section 9, of the Pennsylvania Constitution, where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. *Commonwealth v. Walter,* 600 Pa. 392, 966 A.2d 560, 566 (2009); *Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786, 799 n. 12 (2008); *Commonwealth v. Puksar,* 597 Pa. 240, 951 A.2d 267, 293–94 (2008). *See also* Pa.R.A.P. 2119(a) (each point treated in an argument must be "followed by such discussion and citation of authorities as are deemed pertinent"). It is not the obligation of this Court, even in a capital case, to formulate Appellant's arguments for him. *Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 135 (2008); *Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468, 482–83 (1998).

With those principles in mind, we note that the *entirety* of Appellant's presentation of his third issue, reproduced here verbatim, is as follows:

Appellant was denied a fair trial when the trial court, over repeated objections by defense counsel, erroneously allowed unduly prejudicial evidence in the form of testimony from a law enforcement official regarding a different shooting death by a person other than appellant regarding a case wherein appellant was not convicted, not charged, and not even arrested. (N.T., 6/21/07, p. 44, lines 17–25, p. 45, lines 1–25, and p. 46, lines 1–23.)

Appellant's Brief at 9.[5]

Similarly, the *entirety* of Appellant's presentation of his fourth issue, reproduced here verbatim, is as follows:

> The defendant was further denied a fair trial when the trial court, over repeated objections by defense counsel, erroneously allowed into evidence unduly prejudicial evidence in the form of testimony from a law enforcement official regarding appellant having been arrested at a house (i.e., 2849 North Taney Street) wherein a person other than appellant (i.e., Clinton Robinson) had previously been arrested on a different date (August 31, 2002) for a different crime (i.e., the shooting death of Margaret Thomas). (N.T., 6/21/07, p. 84, lines 12–25, p. 85, lines 1–25, and p. 86, lines 1–16.)

Appellant's Brief at 10.[6]

We have previously cautioned that a brief which includes citations to pages in the notes of testimony, but no specific arguments concerning reasons why each challenged comment deprived an appellant of his right to a fair trial, constitutes the type of cursory legal discussion which is wholly inadequate to preserve an issue for appellate review. *Thomas, supra* at

**5.** The challenged testimony was that of Detective Cummings, the homicide detective who had investigated the murder of Margaret Thomas. Detective Cummings testified that Mr. Smith and Ms. Williams were present at the scene of Ms. Thomas's murder, and that Mr. Smith had also been shot at that scene. Detective Cummings further testified that Mr. Smith had given a statement to police identifying Clinton Robinson in connection with Ms. Thomas's murder. N.T., 6/21/07, at 44–46. Appellant advances not the slightest hint of an argument as to how or why this testimony constituted unduly prejudicial evidence.

**6.** This challenged testimony was given by Detective Burke, the detective in the fugitive unit of the Philadelphia Police Department, who, in October 2002, was assigned to find Clinton Robinson in connection with the homicide of Margaret Thomas. Detective Burke testified that, on February 21, 2003, he went to 2849 North Taney Street in Philadelphia, where he located Mr. Robinson. N.T., 6/21/07, at 84–85. Six days later, the detective returned to the same address, where this time he "c[a]me in contact" with Appellant. *Id.* at 86. Contrary to Appellant's assertion, Detective Burke did *not* testify that Appellant had been *arrested* at 2849 North Taney Street, nor that Appellant had been arrested at the same address as Mr. Robinson. In addition to being undeveloped, Appellant's assertion in issue four does not faithfully reflect the record.

482–83 (citing and quoting from *Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221, 234–35 (1995)). Appellant's **single-sentence "arguments"** for issues three and four fail to provide **any** discussion of his claims; fail to provide **any** reasoned development whatsoever of why the challenged testimony was, in his view, "unduly prejudicial;" and fail to include **any** citation to any authority. We have absolutely no idea what Appellant is arguing in issues three and four. As we will not develop Appellant's arguments for him, these issues are not reviewable. We hold that issues three and four are waived, and accordingly provide no basis upon which to grant Appellant relief. *Commonwealth v. Sherwood,* 982 A.2d 483, 496 (Pa.2009).

 In his fifth issue, Appellant argues that the jury gave undue weight to the DNA evidence retrieved from the baseball cap found at the murder scene. The entirety of Appellant's argument in support of this contention is as follows:

The jury unreasonably failed to realize that the DNA evidence proved nothing more than the following: a) that the defendant probably wore the red baseball cap at some time within the past 15 years; b) that at least two other persons also probably wore that hat within the same time period; and c) that the Commonwealth presented no evidence as to the sequence of when those three (or more) persons probably wore that hat. (N.T., 6/21/07, p. 173, lines 8–20 and p. 174, lines 9–25, as well as throughout pp. 143–197).

Appellant's Brief at 11.

As with issues three and four, issue five is not adequately developed so as to permit appellate review. Additionally, Appellant engages in speculation as to the weight the jury accorded to the DNA evidence, and fails to assert what remedy he is requesting from this Court. Assuming that Appellant seeks a new trial because he thinks that the verdict was against the weight of the evidence (as he argued in his post-sentence motion presented to the trial court), Appellant fails to demonstrate, and indeed does not even argue, that the trial court abused its discretion in denying that motion. *See*

*Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 753 (2000) (holding that appellate review of a weight claim is a review of the trial court's exercise of discretion, not of the underlying question of whether the verdict is or is not against the weight of the evidence, and stating that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence"). Because Appellant fails to address the standard by which this Court reviews a weight of the evidence claim and makes no effort to demonstrate an abuse of discretion by the trial court, we hold that no relief is warranted on issue five.

 Appellant's sixth issue is also a challenge to the verdict based upon the weight that the jury presumably accorded to certain evidence, *i.e.,* the testimony of Commonwealth witness, Bryant Younger. Appellant argues that Mr. Younger was "patently incredible" because 1) he was a convicted liar with a *crimen falsi* record; 2) his testimony was filled with inconsistencies, contradictions, and proven lies; and 3) his cooperation with police was motivated by his desire to avoid a life sentence for a federal drug offense. *See* Appellant's Brief at 12. Once again, Appellant's presentation is devoid of citation to pertinent authority and of any legally-based analysis in support of his position. Nor does Appellant explicitly assert the remedy that he is requesting from this Court. Assuming, again, that Appellant seeks a new trial because he thinks that the verdict was against the weight of the evidence (as he argued in his post-sentence motion presented to the trial court), Appellant fails to argue—much less demonstrate—that the trial court abused its discretion in denying the motion. *See Widmer, supra.* We hold that no relief is due.

Having determined that there was sufficient evidence to sustain Appellant's conviction of first-degree murder and that none of Appellant's challenges to the guilt phase of his trial warrant any relief, we affirm the convictions of first-degree murder, criminal conspiracy, and possession of an instrument of crime.

We turn now to Appellant's final issue, a challenge to the penalty phase of his trial, wherein he argues that the jury unreasonably failed to find any mitigating circumstances that would have precluded imposition of a death sentence. Specifically, Appellant argues that the jury should have found as a mitigating circumstance the fact that he was "only a few months past his eighteenth birthday" on the date of Mr. Smith's murder.[7] *See* Appellant's Brief at 14. During the penalty phase of Appellant's trial, it was stipulated before the jury that Appellant was 18 years and 25 days of age at the time of Mr. Smith's murder. *See* N.T., Penalty Phase, 6/26/07, at 58–59.

Appellant relies upon *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), where the United States Supreme Court noted the distinctions between "juveniles" and "adults," and concluded the Eighth Amendment forbids executing anyone for an offense committed prior to the age of eighteen. In making the distinction between those younger than or older than eighteen, the Court stated:

Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn.... The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

*Id.* at 574, 125 S.Ct. 1183.

There is no question that the matter of Appellant's age at the time of his offense was before the jury; however, the jury,

---

7. Appellant also asserts that the jury ignored the fact that Appellant had "no significant history" of convictions, violent or otherwise. Appellant's Brief at 14. We reject this assertion out of hand because the evidence established that Appellant had previously been convicted of first-degree murder and aggravated assault following a shooting incident in front of an elementary school that led to the death of a 10-year-old school boy and the serious injury of a crossing guard. *See* N.T., Penalty Phase, 6/26/07, at 29–34; n.1, *supra;* text, *infra.*

acting well within its prerogative, did not find Appellant's age to be a mitigating factor. We conclude that *Roper* in no way calls into question the constitutionality of the jury's decision, and accordingly, Appellant's reliance on *Roper* affords no basis upon which to overturn his sentence.

Independent of Appellant's articulated challenge to his sentence, and pursuant to 42 Pa.C.S. § 9711(h)(3), this Court must affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in 42 Pa.C.S. § 9711(d). As set forth in section 9711(c),

> the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

42 Pa.C.S. § 9711(c)(1)(iv).

Our review of the record reveals absolutely no indication, and Appellant suggests none, that the verdict was the product of passion, prejudice, or other arbitrary factor. In addition, the evidence clearly supported the finding of the aggravating circumstance of a significant history of violent felony convictions, as set forth at 42 Pa.C.S. § 9711(d)(9). The Commonwealth established that Appellant had previously been convicted of first-degree murder and aggravated assault in connection with a shooting incident that took place outside an elementary school and resulted in the death of a ten-year-old boy and serious injury to a crossing guard. These convictions are sufficient to satisfy subsection (d)(9). The fact that Appellant's prior murder conviction and his assault conviction arose from a single shooting incident does not reduce their significance and relevance with regard to this aggravating circumstance. *See Commonwealth v. Terry,* 513 Pa. 381, 521 A.2d 398, 411 (1987) (noting that subsection 9711(d)(9) uses the term "conviction," not "incidents" or "transactions," and thus

concluding that this aggravating factor was met even though the appellant's four previous violent felony convictions arose from a single incident). Likewise, the fact that the offenses offered to establish Appellant's history of prior violent felony convictions occurred *after* Mr. Smith's murder is irrelevant. *See Commonwealth v. Sattazahn*, 563 Pa. 533, 763 A.2d 359, 369 (2000) (reiterating that, to establish a defendant's history of violent felony convictions, convictions for offenses committed *after*, as well as before, the murder for which he or she is being sentenced may be considered); *Commonwealth v. Reid*, 537 Pa. 167, 642 A.2d 453, 458 (1994) (rejecting an appellant's assertion that violent offenses committed *after* the murder for which he was being sentenced could not be used to establish a significant history of prior violent offenses for purposes of subsection (d)(9), because the term "significant history" refers to a defendant's status at the time of sentencing, not at the time he committed the murder for which he was being sentenced).

In sum, we affirm both the verdict of guilt and the sentence of death. The Prothonotary is hereby directed to transmit to the Governor the complete records of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court of Pennsylvania, pursuant to 42 Pa.C.S. § 9711(i).

Justice GREENSPAN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, BAER and TODD join the opinion.

Justice SAYLOR files a concurring opinion.

## CONCURRING OPINION

Justice SAYLOR, concurring.

I join the majority opinion.

My only comment is to express continuing concern regarding the many cases in which we are seeing a clear failure, on the part of counsel, to provide the professional services neces-

sary to secure appellate review on the merits of a capital defendant's or petitioner's claims. *See, e.g., Commonwealth v. Walter,* 600 Pa. 392, 397–404, 966 A.2d 560, 563–67 (2009) (describing various of a capital appellant's claims as "unintelligible," underdeveloped, "vague and confusing," waived, "incomprehensible," and "incapable of review"). This is a matter which certainly merits ongoing monitoring by this Court in its supervisory capacity. The close attention of the Legislature is warranted as well, at the very least in terms of ensuring the availability of appropriate funding to provide the resources necessary to continue to reconcile its scheme of capital punishment with the constitutional mandate of an adequate defense for indigent individuals whom a State seeks to put to death.