J-S32001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A. M. L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.R.B., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 742 WDA 2021 |

Appeal from the Decree Entered June 2, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  No. a 057 OF 2020

BEFORE:  LAZARUS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:          **FILED: NOVEMBER 12, 2021**

J.R.B., Jr. (Father) appeals from the trial court's decree involuntarily terminating his parental rights to his daughter, A.M.L. (Child) (born June 2011).  After careful consideration, we affirm.

Mother and Father resided together, but were never married, prior to Child's birth.  Child, Mother, and Child's brother lived together after Child was born.  Mother began dating S.D. (Stepfather) in 2014; they married in May of 2018.  In January of 2015, Mother, Stepfather, Child and Child's brother moved into a new home together, where they continued to reside at the time of the instant proceedings.

On June 20, 2017, Father filed a complaint against Mother seeking partial custody of Child.  On August 29, 2017, the court granted Mother sole legal custody and primary physical custody of Child; Father was ordered to have supervised, physical custody of Child, to be arranged by Father, and to

participate in reunification counseling. In October 2017, the court set Father's monthly support obligation at $275.00; Father consistently failed to pay support through 2020, resulting in numerous contempt proceedings and eleven contempt findings. Father also failed to schedule any visits with Child and did not participate in reunification counseling. On January 16, 2018, the court gave Father additional time to hire a qualified supervisor and identify a facility for visits with Child. Father, again, failed to secure a supervisor or facility to host visits with Child.

On October 8, 2020, Mother filed a petition to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1)-(2) and 2512. At the same time, Stepfather filed a petition to adopt Child. On May 11, 2021, the Honorable Joseph K. Williams, III, presided over a termination hearing at which Mother, Father, Stepfather, Child's court-appointed Guardian *Ad Litem* (GAL), and Child's attorney testified.[1] On June 2, 2021, the trial court entered an order involuntarily terminating Father's parental rights to Child based on sections 2511(a)(1), (2), and (b) of the

---

[1] Child was represented by GAL, Margaret Gold, Esquire, and attorney, Arnold Caplan, Esquire, at the termination hearing. **See** 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc); **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination[]of[]parental[]rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). Both attorneys participated in the termination hearing and filed briefs in this appeal.

Adoption Act.[2]   In its termination order, the court made the following statements regarding its decision to terminate Father's rights under subsections 2511(a)(1) & (2):

> There are two circumstances that really push this [c]ourt to conclude that [F]ather has demonstrated a settled purpose of relinquishing his parental claim.  Father obtained a custody order allowing him interaction with [C]hild.  But, he did nothing to effectuate that right.  He had not seen [C]hild for about 5 years.  More damaging to his cause than that absence, is when he received word that [C]hild was having a medical issue.  He did nothing to help in that regard.  The totality of the evidence cleared the clear and convincing hurdle of demonstrating a settled purpose of relinquishment.
>
> *    *    *
>
> The same circumstances as detailed above also help establish the requirements of termination under sub-section (a)(2).  [Father's] absence from [C]hild's life, even though he had his "permission slip" to visit with [C]hild, is neglect.  On top of that, more neglect is found through his failure to take any remedial actions to help with his own child's medical diagnosis.  A parent does not run from an issue involving their child, they run to the problem.
>
> A common refrain from [F]ather is that [M]other is to blame for his predicament.  It is not persuasive and leads to the credibility meter pointing away from him.  The failure to deliver a birthday bike to his daughter is not an example.  Father says it was not delivered because [M]other would not have given it to their child.  A simple delivery to the front porch followed by a photograph showing the bike's presence and then a birthday text with the accompanying photograph would demonstrate [F]ather has

_____

[2] 23 Pa.C.S.A. §§ 2101-2938.

[C]hild's best interest at heart and not playing the blame game with his [former] paramour.

This second ground for termination of [F]ather's parental rights has been proven in a clear and convincing manner.

Order, 4/2/21, at 3-4. With regard to section 2511(b), the court found that "[t]here is no escaping the fact that [C]hild is doing quite well in the environment with [S]tepfather[]," *id.* at 4, that Child is living in a "safe, secure, and stable" environment with Mother and Stepfather[], *id.*, and that "the [c]ourt is influenced by the continuity of relationships [Child] has developed." *Id.* Finally, although the court acknowledged Father's love for Child, the court stressed that Father has not shown the true meaning of love towards Child through his actions or deeds. *Id.* Thus, the court concluded that terminating Father's parental rights would best serve Child's needs and welfare.

Father filed a timely *pro se* notice of appeal[3] and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He presents the following issues for our consideration:

(1) Did the [trial] court abuse its discretion and commit an error of law when it held that the statutory grounds for involuntary termination of Father's parental rights to Child were met under 23 Pa.C.[]S.A. § 2511(a)(1), thereby determining that Father, by conduct continuing for at least six (6) months immediately preceding the filing of the

---

[3] On July 21, 2021, Father's court-appointed counsel, Deborah L. Lesko, Esquire, filed a petition to withdraw from representation. On June 21, 2021, Father filed a *pro se* emergency petition for court-appointed counsel. On July 8, 2021, the trial court granted counsel's request to withdraw, granted Father's emergency petition, and appointed Gerri L. Sperling, Esquire, to represent Father on appeal.

petition to involuntarily terminate his parental rights, had failed or refused to perform parental duties?

(2) Did the [trial] court abuse its discretion and commit an error of law when it held that the statutory grounds for involuntary termination of Father's parental rights of Child were met under 23 Pa.C.S.A. § 2511(a)(2), thereby determining that the repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused [C]hild to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by [Father]?

(3) Did the [trial] court abuse its discretion when it determined[,] based upon hearsay evidence from the guardian *ad litem* and counsel for the Child[,] that terminating Father's parental rights best serves the development[al], physical[,] and emotional needs and welfare of the Child, as required under 23 Pa.C.S.A. § 2511(b)?

Father's Brief, at 6-7.

Our standard or review for the trial court's order involuntarily terminating parental rights is well-settled:

In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation

omitted). *See also In C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party

- 5 -

seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S.A. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S.A. § 2511(b)).

At the termination hearing, Mother testified that terminating Father's parental rights was in the best interest of Child, where Father "ha[d] not been in [Child's] life for almost six years." N.T. Termination Hearing, 5/11/21, at 8. Mother testified the last time Father had seen Child was June 1, 2015, *id.* at 12, and that from 2015-2017 Father wasn't communicating much with Mother about Child. *Id.* at 16. Since he last saw Child, Father and Child have spoken once over the phone in May 201, and that call was initiated by Child. *Id.* at 46. Father called Mother and left messages or texted Mother to wish Child a happy birthday annually. Mother testified that Child is a well-adjusted,[4] happy child who is thriving in Mother and Stepfather's care. *Id.* at 68, 96. Mother, however, did acknowledge that before June of 2015, Father and Child were "bonded" and that "[Child] was always happy to see [Father] whenever he could get her." *Id.* at 82-83. Mother also testified, however, that Stepfather had been in Child's life for seven years at the time of the termination hearing and "had been taking care of her since she was age[d]

---

[4] Child had been diagnosed in September 2017 with adjustment disorder and was receiving therapeutic services through her school.

three . . [and that] he has been there since, you know, he's stepped up in [Child's] life [and h]e will continue to do that every day." ***Id.*** at 105.

At the hearing, Stepfather testified that he met Mother in 2014, married her in 2018, and, since 2015, has been residing with Mother, their son together, his daughter from a prior marriage, and Child. Stepfather testified that he has never seen any pictures, letters, or gifts from Father sent to Child at the house. Stepfather testified that he considers Child as though she is his biological daughter, that he has a loving and close relationship with Child, and that he supports Child financially and emotionally. ***Id.*** at 111-15.

Attorney Gold, Child's GAL, testified that she filed a report on February 15, 2021,[5] after meeting with Mother, Father, and Child. The GAL testified that Child indicated to her that she had no contact with Father, that she does not receive any calls, gifts, cards, letters, or any other type of communication from Father, and that "she is fine without him." ***Id.*** at 121. The GAL testified that Child is "happy," ***id.*** at 122, that Stepfather takes care of her and that she can count on him, ***id.***, that Child understands the concept of adoption, and that Child would be fine without Father in her life. ***Id.*** Finally, the GAL testified that there is currently no bond[6] between Father and Child "that if severed would cause [Child] any harm." ***Id.***

_____

[5] The GAL's report and supplemental report were admitted as an exhibit at the termination hearing. ***See id.*** at 129 (moving report into evidence as "Exhibit P10").

[6] The GAL admitted, on cross-examination, that she had never personally observed Child and Father interact. ***Id.*** at 128.

After hearing the GAL testify, the trial judge expressed the following concerns:

> [I]rrespective of what [Mother] did[, Father] was not vigilant enough to get his [Child]. . . . In this situation, it seems, from what I've heard, that [Mother] was always the one that was the protagonist, who was trying to get the contact, who made the calls, who took [Child] here, who was the transporter to everything. I don't see the maturity on [Father's] part that I would expect from a Father.
>
> *    *    *
>
> You know, [Child] hasn't called [Stepfather "]dad["] yet, but I think [Stepfather] has done the structural things and the support things that's consistent. That's what [Child] needed to right her ship. That's what I'm hearing so far.

*Id.* at 125-26.

Next, Child's attorney, Arnold Caplan, Esquire, testified that he authored a report after reviewing the pleadings, the GAL's report and supplemental report, and having a half-hour Zoom remote conference call with Child in April of 2017. Attorney Caplan testified that Child "clear[ly], unequivocal[ly], and [consistent[ly] . . . said she really didn't want to see [Father] or . . . be involved with him." *Id.* at 135. Attorney Caplan also testified that Child expressed that it would not matter to her if Father remained in her life because she "do[es]n't know him" and that she would be fine if Father was no longer involved with her. *Id.* In fact, Child told Attorney Caplan that she was not even certain she would recognize Father if he were walking down the street. *Id.* at 135-36. On the other hand, Attorney Caplan testified that Child told him she would be sad if Stepfather were no longer involved in her life. *Id.* at

- 8 -

136. Finally, Attorney Caplan indicated that he believed Child's legal interests were consistent with what the GAL believed were Child's best interests. *Id.* at 137.

Finally, Father testified that he and Mother lived together from 2009 until the end of Mother's pregnancy with Child. In 2011, Mother moved out of the house she shared with Father and into maternal grandmother's house. Although Father remained in contact with Mother throughout the end of her pregnancy and while Mother was admitted to the hospital for Child's birth, Father was not "allowed to bring [Child] to [his] home" until Child was "about two and a half months [old]." *Id.* at 144. Father testified he would have Child at his home "[b]asically every other weekend or every weekend[;]" this schedule lasted approximately until June 1, 2015. *Id.* at 145. When Father had Child at his home, where she had her own bedroom, Father testified he took care of her by bathing, dressing, feeding, and playing with her. *Id.* at 148. Father testified during the time that Child would stay with him on weekends, he had a "[g]reat, [p]riceless" relationship with her. *Id.* at 149.[7]

The weekend of May 29-31, 2015 was the last time that Father saw Child. Father testified that he noticed a large scab in the middle of Child's back when she was bathing. *Id.* at 152-53. When Father asked Mother what happened to Child, Mother "played dumb, didn't acknowledge it." *Id.* at 156.

---

[7] Father testified he lost his license for 90 days in 2014 as a result of a DUI. During that time, paternal grandfather would transport Child to and from visits with Father. *Id.* at 149-50.

Father testified that after the end-of-May visit with Child, Mother would not let him see Child. *See id.* at 162 (Father testifying, "I called [Mother] and I was on my way to get [Child] and then [Mother] called me up and says, [`]you know what, if you want to see [Child], you get an attorney.'"). Father testified he called and texted Mother numerous times after June 1, 2015, to get permission for him to continue to see Child; Mother reiterated Father should get an attorney if he wanted to see Child. *Id.* at 164. In late 2016, Father retained an attorney to obtain custody of Child. *Id.* at 170. Father was ultimately granted supervised visits with Child, but he had to arrange and pay for the visits himself. *Id.* at 172. Father testified that in January 2019 he contacted the appropriate person to set up visits, but did not schedule any visits because he "didn't have sufficient funds" to pay for them. *Id.* at 173. Father said that he continued to call Mother weekly to try to arrange some type of visit with Child. *Id.* at 174.

Father admitted that due to his erratic payment schedule, he often paid his child support obligation every two to three months, instead of the court-ordered monthly payments. *Id.* at 177-78. Father also testified that the reason he did not send gifts, cards, or letters to Child was because he did not think Mother would give them to Child. *Id.* at 185 ("So [Mother's] definitely not going to get a card from me for [Child] . . . [b]ecause [Mother] didn't want me to be known.").

On cross-examination, Father admitted that from 2018 through 2020, his phone calls to Mother "got fewer and fewer." *Id.* at 195. Father confirmed

that he communicated with Mother three times in 2018 (two texts and one phone call), nine times in 2019 (seven texts and two phone calls), and six times in 2020 (five texts and one phone call). *Id.* at 197. Father also testified that he did not look into whether he could file any documents or motions with the court to obtain visitation or reduce support payments. *Id.* at 198. Finally, Father testified that, although he knew Child had been diagnosed with anxiety disorder, he took no steps to intervene and try to obtain custody of Child for years. *Id.* at 206.

With respect to section 2511(a)(1),[8] our Supreme Court has held,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

---

[8] We can affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

In *In re Adoption of Faith M.*, 501 A.2d 1105 (Pa. 1985), our Supreme Court noted that a parent's failure to provide support is not conclusive in termination proceedings, but "it is a factor to be considered in determining whether the parent has forfeited parental rights." *Id.* at 1108. The Court noted that there are "certainly other, non-financial resources available to [parents] if [they] so chose to use them." *Id.* at 1109. Examples of these non-monetary efforts include a parent petitioning the court to modify support payments or attempting to send children personalized letters and photographs. *Id.*

Here, Father acknowledged that he never inquired as to what steps he could take through the court system to try to see Child, never petitioned to have his support payments reduced, and never made the effort to send Child personalized letters, cards, or gifts. *See Smith Adoption Case*, 194 A.2d 919, 922 (Pa. 1963) ("Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities while others adequately provide the child with her immediate and continuing physical and emotional needs."). While we are certainly sympathetic to Father's financial hardships, under the instant facts we cannot conclude that that the trial court erred in terminating Father's parental rights under section 2511(a)(1). The evidence clearly and convincingly established that for "at least six months[, Father] evidenced a

settled purpose of relinquishing parental claim to [Child] or . . . refused to or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1).

Next, Father claims that there was insufficient evidence to support the trial court's determination that the needs and welfare of Child were met by terminating his parental rights. **See** 23 Pa.C.S.A. § 2511(b).

With respect to section 2511(b), we have explained:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. **In In re C.M.S.**, 884 A.2d 1284 [] (Pa. Super. 2005), this Court stated, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." [**Id.** at 1287.] In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with [the] utmost attention to the effect on the child of permanently severing that bond. **Id.** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, [] 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 63.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

In challenging the court's determination under section 2511(b), Father specifically alleges that the court erred in admitting hearsay statements from Child that "went to the heart of the issue [of] whether it was in Child's best interests to terminate Father's parental rights." Father's Brief, at 25, 28.[9]

---

[9] Father preserved this issue at the termination hearing by objecting to the alleged hearsay statements, made by the GAL and Attorney Caplan. **See** N.T. Termination Hearing, 5/11/21, at 130, 138. However, while Father's final issue states that the court erred in permitting Attorney Caplan to testify

*(Footnote Continued Next Page)*

Father states that "this appeal provides a perfect opportunity for this Court to re-examine its precedents regarding hearsay of a minor child who is old enough, intelligent enough, and articulate enough for the [trial] court to interview." *Id.* at 25. To support his argument, Father cites to Justice Wecht's dissent in *Interest of J.C.F.*, 199 A.3d 859 (Pa. Super. 2018) (per curiam order denying petition for allowance of appeal), which noted that "it is [a] particularly troubling concern" when the admitted statement "goes directly to the ultimate question of whether parental rights should be terminated." *Id.* at 860.

In *In re B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001), a mother challenged the admission of an expert's opinion that the mother did not possess the mental stability to be an effective parent. The opinion was rendered by a psychologist based upon "a thorough and detailed evaluation of mother's records." *Id.* at 1011. In affirming the decision on appeal, our Court noted that the trial court did not err in failing to schedule an additional hearing to allow child to testify "where the record unequivocally establishes that the child's needs and welfare are best served by termination of mother's parental

---

regarding Child's hearsay statements, he does not present any argument with regard to Child's attorney in the argument section of his brief. Thus, we find any claim involving Attorney Caplan on this issue is waived. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); Pa.R.A.P. 2119(a).

rights [and] where [child] was represented by a [GAL] who presented her own expert evidence with respect to child's needs and welfare." *Id.* Moreover, the Court found that there was no case law or statutory authority to support mother's contention that child was required to testify at a termination hearing. *Id.* Specifically, the Court held that "[t]he testimony or preference of the child(ren) is not required or permitted in an involuntary proceeding[,] as the child cannot cede his right to minimal proper nurturing." *Id.* at 1014.

More recently, in *In re B.J.Z.*, 207 A.3d 914 (Pa. Super. 2019), our Court reaffirmed the fact that, even where minor children are able to verbalize their wishes, children's counsel was permitted to provide the trial court with information as to children's positions on the question of parental termination, in lieu of children testifying to same. Specifically, in *B.J.Z.*, the trial court permitted children's "legal-interests" attorney to testify regarding whether children understood why they were living with a foster family and only visited with their parents, and whether they would like things to continue that way. *Id.* at 918. The court noted that children's attorney "shared additional insights and represented that [] Children very much want to stay with their foster parents, even if they do not see their parents for potentially long periods of time[, that] Children feel 'safe and happy' with the foster family, [and that] they know their parents have not taken appropriate care of them and are still unable to do so at this time." *Id.* at 919.

We decline to accept Father's invitation to overturn established case law that permits a child's representative to testify regarding a minor's wishes at a

termination hearing. A GAL is statutorily obligated to "[a]dvise the court of the child's wishes to the extent that they can be ascertained and present to the court whatever evidence exists to support the child's wishes." 42 Pa.C.S.A. § 6311(b)(9). Moreover, here, the GAL's testimony summarized the findings memorialized in her expert report, which was admitted into evidence, and which included her professional recommendation regarding terminating Father's parental rights to Child based, in large part, upon her evaluation of, and interactions with, Child.

Finally, as Child's counsel acknowledges in his brief, the GAL's testimony regarding her "impressions" of Child were not a dispositive factor in the court's section 2511(b) analysis. Rather, the court found Father's complete abandonment of parental duties for the almost-six years prior to the termination proceeding was the significant reason for concluding that termination would best serve Child's needs and welfare. In addition, the court gave considerable weight to the fact that Stepfather, who intends to adopt Child, has been financially and emotionally supporting Child for the past six years and, as a result, has established a strong and consistent bond with Child. *In re Adoption of J.M.*, *supra* at 324 ("[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/12/2021