J-A30011-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| T.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.F., A/K/A J.S. | : | |
| | : | |
| Appellant | : | No. 103 WDA 2018 |

Appeal from the Order December 22, 2017
In the Court of Common Pleas of Fayette County Civil Division at No(s):
2129 OF 2007 G.D.

| | | |
|---|---|---|
| T.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.F., N/K/A J.S. | : | |
| | : | |
| Appellant | : | No. 436 WDA 2018 |

Appeal from the Order Entered March 22, 2018
In the Court of Common Pleas of Fayette County Civil Division at No(s):
2129 of 2007 GD

| | | |
|---|---|---|
| R.F.-S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| T.S. | : | |
| | : | |
| | : | No. 530 WDA 2018 |
| APPEAL OF: J.S., MOTHER OF R.F.-S. | : | |

Appeal from the Order Entered March 21, 2018
In the Court of Common Pleas of Fayette County Civil Division at No(s):
492 OF 2018

BEFORE:   SHOGAN, J., KUNSELMAN, J., and STRASSBURGER,* J.

MEMORANDUM BY SHOGAN, J.:                    FILED NOVEMBER 26, 2018

The first of these consolidated appeals, Docket Number 103 WDA 2018 filed by J.F., also known as J.S. ("Mother"), pro se, is based upon a final custody order dated December 22, 2017, concerning thirteen-year-old R.F.S. ("Child"), the only child of Mother and T.S. ("Father").  The appeal at Docket Number 436 WDA 2018, is from an order entered March 22, 2018, directing Mother to cooperate with the Guardian ad Litem and court-appointed counsel for Child.  The third appeal, at Docket Number 530 WDA 2018, is based upon a March 21, 2018 order dismissing Mother's petition pursuant to the Protection from Abuse Act, 23 Pa.C.S. §§ 6101–6122 ("PFA Act").  For the following reasons, we quash the appeal at 436 WDA 2018 and affirm the appeals at 103 WDA 2018 and 530 WDA 2018.

The appeal at 436 WDA 2018 is quashed because it is not from a final order.  It is well settled that an appeal may be taken from:  (1) a final order or an order certified as a final order (Pa.R.A.P. 341); (2) an interlocutory order as of right (Pa.R.A.P. 311); (3) an interlocutory order by permission (Pa.R.A.P. 312, 42 Pa.C.S. § 702(b)); or (4) a collateral order (Pa.R.A.P. 313).  See Pace v. Thomas Jefferson University Hospital, 717 A.2d 539, 540 (Pa. Super. 1998) (discussing the appealability of orders).

_____

* Retired Senior Judge assigned to the Superior Court.

- 2 -

The order on appeal in Docket 436 WDA 2018, which directs Mother's cooperation with the GAL and counsel for Child, is not a final order. Pennsylvania Rule of Appellate Procedure 341 defines final orders as follows:

(a) General rule. Except as prescribed in paragraphs (d) and (e) of this rule, an appeal may be taken as of right from any final order of a government unit or trial court.

(b) Definition of Final Order. A final order is any order that:

(1) disposes of all claims and of all parties; or

(2) RESCINDED

(3) is entered as a final order pursuant to paragraph (c) of this rule.

(c) Determination of finality. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim or when multiple parties are involved, the trial court or other governmental unit may enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case. Such an order becomes appealable when entered. In the absence of such a determination and entry of a final order, any order or other form of decision that adjudicates fewer than all the claims and parties shall not constitute a final order. . . .

Pa.R.A.P. 341 (emphasis added). Thus, pursuant to Rule 341, an order is final if it disposes of all claims and all parties or if a statute expressly defines it as final. Clearly, as the March 22, 2018 order does not dispose of all claims and all parties, it is not final, and we quash the appeal at 436 WDA 2018.[1]

_____

[1] If quashal of the appeal were not required, we would affirm on the Statement in Lieu of Opinion filed July 20, 2018.

Concerning the appeals at Dockets 103 and 530 WDA 2018, our result initially is guided by Pa.R.A.P. 2101 ("Conformance with Requirements"):

> Briefs and reproduced records shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed, and, if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed.

"Although this Court is willing to liberally construe materials filed by a pro se litigant, pro se status confers no special benefit upon the appellant. To the contrary, any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing." In re Ullman, 995 A.2d 1207, 1211–1212 (Pa. Super. 2010). Accordingly, pro se litigants must comply with the procedural rules set forth in the Pennsylvania Rules of Court. Commonwealth v. Tchirkow, 160 A.3d 798, 804 (Pa. Super. 2017) (citation omitted).

In the instant matter, the "briefs" filed by Mother, in all cases, and in all respects, fail to conform to the Pennsylvania Rules of Appellate Procedure. There are no statements of jurisdiction, no identification of the orders appealed, no statements of the questions involved, no statements of the case, no summaries of argument, no arguments of identified issues, and no conclusions. See Pa.R.A.P. 2114–2119 (addressing specific requirements of appellate briefs). Mother has included no citations to the notes of testimony. Most egregious is Mother's complete failure to identify issues on appeal in any brief. Indeed, the guardian ad litem and counsel for Child have filed letters

indicating that they were unable to file briefs in the case due to their inability to identify issues raised by Mother.

"This Court will not act as counsel and will not develop arguments on behalf of an appellant." Coulter v. Ramsden, 94 A.3d 1080, 1088 (Pa. Super. 2014). "When issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof." Commonwealth v. Sanford, 445 A.2d 149, 150 (Pa. Super. 1982); see also Commonwealth v. Rompilla, 983 A.2d 1207, 1210 (Pa. 2009) ("Appellant's failure to adequately develop his arguments or support his bald assertions with sufficient citation to legal authority impedes meaningful judicial review of his claims"); Stimmler v. Chestnut Hill Hosp., 981 A.2d 145, 153 n.9 (Pa. 2009) (argument portion of brief must contain "sufficient citation to the record and legal authority, together with analysis, to guide this Court in its review of the issue.").

As we stated in Lechowicz v. Moser, 164 A.3d 1271, 1276–1277 (Pa. Super. 2017):

> The Rules of Appellate Procedure require the argument section of an appellate brief to include "citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). It is not the role of this Court to develop an appellant's argument where the brief provides mere cursory legal discussion. Commonwealth v. Johnson, 604 Pa. 176, 985 A.2d 915, 925 (2009), cert. denied, 562 U.S. 906, 131 S.Ct. 250, 178 L.Ed.2d 165 (2010); see also In re C.R., 113 A.3d 328, 336 (Pa. Super. 2015), appeal denied, 633 Pa. 760, 125 A.3d 1197 (2015) ("This Court will not consider an argument where an appellant fails to cite to any legal authority or otherwise develop the issue.").

Thus, because the defects in Mother's briefs are so substantial that they impair our ability to conduct a meaningful review, we could dismiss the appeals. In consideration of the nature of the case, however, and in light of our conclusion that Mother's list of "failures" in the cases, see Mother's Brief in Docket 103 WDA 2018 at 3–11 and Mother's Brief in Docket 530 WDA 2018 at 2–7, may be construed as issues she is attempting to raise, we have examined the record certified to us on appeal to determine their merit.

We reject Mother's bald assertions and conclude that the thorough, detailed, and comprehensive opinions of the trial courts address Mother's identified "failures," and we rely on those opinions in affirming these cases. See Statement in Lieu of Opinion, 3/29/18, in Docket 103 WDA 2018; PFA Court Opinion, 6/19/18 in Docket 530 WDA 2018.[2]

The order of December 22, 2017, in Docket 103 WDA 2018 is affirmed. The appeal of the order of March 22, 2018, in Docket 436 WDA 2018 is quashed. The order of March 21, 2018, in Docket 530 WDA 2018 is affirmed.[3]

_____

[2] We direct the parties to attach a copy of the trial court opinions in the event of further proceedings in this matter.

[3] There are two outstanding motions in these appeals. Father's Application to Strike Inadmissible Exhibits Beyond Record filed October 22, 2018, is DENIED as moot. Father's Cumulative Response to Appellant's Filings filed October 23, 2018, is DENIED as moot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/26/2018</u>

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA

T.S.,

           **Plaintiff,**

    **v.**

J.F., n/k/a J.S.

           **Defendant.**

CIVIL DIVISION

No. 2129 of 2007, G.D.

## STATEMENT IN LIEU OF OPINION

Before the Court is a "Motion to Appeal" of Defendant J.F., n/k/a J.S., (hereinafter "Mother"), filed on January 12, 2018. Mother appeals from the final custody order entered on December 22, 2017, although she may also be contesting other matters as well. Substantive hearings were held on May 19, 2017, October 24, 2017, November 14, 2017 and on December 15, 2017. A hearing was also scheduled on June 1, but it was continued by Mother's then counsel so she could obtain psychological evaluations of all parties—which evaluations were never done. Transcripts of the above hearings have not been filed of record. Mother's Motion to Appeal contains dozens of pages, including Argument and a number of exhibits, but it does not appear to contain a Request for Transcript as required by Pa. R.A.P. 1911(c). As a result, the undersigned is unable to review or cite same.

The custody order entered on December 22, 2017 was an amalgam of the proposals submitted by the attorneys then representing both sides. Father did seek primary physical custody as a contempt sanction, on the basis that Mother had

1

repeatedly defied every prior order entered by the court, but this court did not consider any of the hearings to be on the issue of primary custody. Instead, the court's focus was entirely on whether to resume visitation or partial physical custody for Father. The court concluded that Mother was the cause of the child's alienation from Father, but that it was inappropriate to change primary custody. Ultimately, the undersigned awarded Father only supervised visitations followed by limited supervised partial physical custody.[1]

---

[1] To briefly address the factors contained in §5328 of the Domestic Relations Code: 1. Mother is adamantly opposed to Father or Father's family having any contact with the child. Father has not sought primary custody except as a sanction for Mother's repeated refusals to comply with the existing court orders. 2. There has never been any finding—properly introduced in evidence—of any abuse by or of anyone that is relevant to this proceeding. None of the testimony causes this court to find that any relevant abuse has occurred. Father admits "flicking" or "clicking" R        in the head and pulling her hair on one occasion, but asserts it was done in a playful manner while they were wrestling, and was not discipline or punishment of any kind. Even if it was an attempt at discipline, it clearly did not exceed the justification set forth in §509(1) of the Crimes Code. 3. Mother has clearly performed the bulk of nurturing and the physical duties of parenting. However, it appears that Father is ready, willing, and able to perform such duties if he is permitted to resume a relationship with his daughter. 4. The stability and continuity of the child's life was disturbed by Mother's extreme overreaction to the "flicking/hair-pulling" incident. Moreover, the court has concluded that daughter's subsequent testimony that Father threatened to kill her was either entirely fabricated by repeated suggestions from Mother, or was a deliberately exaggerated and distorted view of a harmless but inapt comment that resulted from "brainwashing" by Mother. 5. Father has substantial extended family that is willing and able to provide any reasonable level of supervision that might be thought to be required. Mother has two other children, one of whom is the child of her current husband, and the other of which has no contact with its biological father. Mother's current husband appears to be loyally following Mother's lead. 6. The two half-siblings mentioned above are the only sibling relationships. 7. The undersigned does not believe the child's preference is mature or well-reasoned, but is the result of incessant parental alienation suggested to her by Mother. 8. See the response immediately above. 9. Both parents are capable of maintaining an appropriate relationship with the child, but Father's ability to do so has been frustrated by Mother's ongoing course of conduct whereby she has fostered and incubated irrational and exaggerated fears in her child's mind. 10. Both parties are capable of attending to the daily needs of the child. Mother is clearly positioned to be the primary custodian at this point, as the child has been brainwashed to the point that even Herculean efforts might not reunite this child with her Father. Awarding primary custody to Father at this point is contraindicated by every professional opinion that the undersigned has ever studied. 11. The proximity of the residences is not a factor. Transportation is easily and inexpensively available. 12. Child care is not a serious factor. Both parties have the ability to care for the child and/or to provide safe and reliable alternate child care through other responsible family members. 13. The level of conflict between the parties is the problem, and it may be insoluble. Mother asserts, and may even sincerely believe in a delusional construct, that she is protecting the child from imminent abuse by Father. That is patent nonsense. Outside of Mother's bald assertions, there is no credible reason to believe that Father would ever deliberately cause any physical harm to his daughter. Until the emergency motion was filed in February, 2016, when the child was ten years old, there was no evidence of any problem with Father's partial custody of the child from birth to that time. 14. There is some evidence that Father has had problems involving substance abuse. To the extent that there is a valid reason for requiring that Father's visitations with the child be supervised for a period of time, it is that Father has had issues with substance abuse and has a suspended driver's

The proposal submitted by Mother's counsel included joint legal custody and two—two hour professionally supervised visitations per week.[2] The decision to include additional supervised visits at Mother's church was the result of Mother's own suggestion in open court. The longer periods of time using paternal aunts as supervisors originated in Father's proposal, and is the only portion of the order that substantially differed from Mother's own proposal.

In order to avoid unnecessary repetition the undersigned hereby incorporates by reference the "Statement in Lieu of Opinion" filed on a previous appeal on October 2, 2017, wherein the significant previous history of this case is set forth at length. Many of the "issues" raised by Mother here have previously been litigated or waived.

The previous *status quo* was established by an agreed order dated August 1, 2013, wherein Mother maintained primary custody, but Father had substantial periods of partial physical custody. The instant situation stems from the "Emergency Motion to Modify Order of Custody" filed by Mother's counsel on February 10, 2016. On the basis of that, the undersigned temporarily suspended Father's partial custody rights—rights that have not been completely reinstated to this day.

There are a number of allegations contained in that Emergency Motion, including an allegation of "flicking" and "hair pulling," as well as an allegation of Father driving the child while drunk and unlicensed, and an allegation that the child had anxiety from her visits with Father. Notable for its absence, however, in that Emergency Motion, is the currently asserted allegation that Father threatened to kill his daughter. When that

---

license. Under the order, all transportation must be provided by a licensed driver. 15. Both parties are in reasonably good physical condition. The undersigned suspects that Mother suffers from paranoia and/or Munchausen's Syndrome by Proxy and/or other conditions, but the evidence of same is circumstantial, and insufficient for a factual finding. 16. The undersigned does not discern any other relevant factor not covered above.

[2] The extremely high cost of professionally supervised visits makes the offer an empty gesture.

allegation was ultimately revealed in testimony (believed to be on April 19, 2017, more than a year after visits were suspended) by the child, the undersigned concluded that the allegation was fabricated, or at best, exaggerated on the basis of a joking comment. That missing threat is the crux of the current situation, as Mother continues to insist that the threat was actually made, and that anyone that returns the child to her Father at any time under any level of supervision will then be responsible for the child's inevitable death. Psychological examinations were arranged for all parties on Mother's Motion, but Mother ultimately sabotaged the examinations. Multiple counselors have attempted to counsel and reunite Father and his daughter, but Mother has successfully interfered with every effort.

The Mother raises multiple issues on appeal that have nothing to do with the issues that were contested at the various hearings. Numbers have been added to the issues she raises and they are listed below in bold, followed by the Court's statement as to each in normal type.

1. **"Charity Kruppa (sic) was T. S.'s (hereinafter "Father") attorney on the case and appeared for all proceedings from 5/2026 (sic) to date. Charity Kruppa (sic) was Judge Leskinen's Law Clerk and was a conflict of interest on the case."**

Charity Grimm Krupa was a law clerk that the undersigned worked with approximately ten years ago. Fayette County is a relatively small county, with five judges and fewer than fifty attorneys actively involved in litigation. The undersigned has worked with approximately sixteen law clerks in the last sixteen years, and seven of them are active in Fayette County in civil and criminal litigation at present, including three in the District Attorney's Office and one in the Public Defender's Office. The undersigned does not have, and has never had, any social relationship with Attorney

4

Krupa.

Judicial disqualification is governed by Rule 2.11 of the Code of Judicial Conduct. Specific situations requiring recusal are listed in subsections (A)(1) through (A)(6), and none of those specific provisions apply here. What remains is the generic disqualification contained in subsection (A)—"the judge's impartiality might reasonably be questioned." At least twenty former law clerks, including the undersigned, have appeared in front of the judge or judges they previously worked with over the last forty years that the undersigned has been in practice in Fayette County, with no other complaints being lodged to my knowledge. As a result, by local standards at least, it has not been thought reasonable to question the impartiality of the judge on that basis. If a different standard applies in other counties, that standard has not been presented to the undersigned.

Mother has been very public with her displeasure at anyone, including the judicial system, having a contrary opinion about the best custodial arrangements for her daughter. The undersigned has been reported on multiple occasions to virtually every agency or board thought to have any supervisory authority over judges. See her online video: https://www.facebook.com/toccarenon/videos/567584613619716/. As a result, the undersigned has consulted with the Fayette County Court Administrator who has consulted with counsel for the AOPC. No recommendation as to recusal was forthcoming, and the undersigned is convinced that recusal by one judge will just delay these proceedings further, without any benefit to the parties or the child. The undersigned would welcome recusal if it could be justified on any basis other than the desire to avoid an unpleasant duty.

5

Mother has been unable to keep any one attorney, and has cycled through at least eight during the course of this proceeding. Social workers and counselors that she has selected, as well as counselors that have been appointed by the court, have all ultimately refused to continue to participate because of her aggressively obstructive behavior. With but one exception, Mother has refused to allow the child to consult with the Guardian Ad Litem or the Attorney that has been appointed to represent the child. Despite refusing to allow them to meet with the child, she has complained that the Guardian only met with the child on one occasion! Most recently, just this past week, Mother appeared and asserted that any contact between the child and Father will be deadly to the child, and that she is the Mother and she knows better than anyone else. Ultimately she cried and screamed and proceedings had to be adjourned. (See Transcript of Motions Court, March 22, 2018). If the undersigned ultimately recuses, the new judge will have to go through similar delays caused by Mother's ongoing resistance, and meanwhile the child will get no closer to reuniting with her Father.

2. **"Father never entered his criminal verification pursuant to 1915.3-2 record until 7/2017. The Judge allowed proceedings to take place and move forward without Father's form. After Father entered form he committed perjury on un-factual information, as Father addressed this to the court the Judge ignored Mother once again."**

The record will reflect when the criminal verifications were filed. Father's relatively minor criminal history (2 DUIs, 2005 and 2008) was clearly known to the court at all times relevant herein, and was certainly known well in advance of the entry of the December 22, 2017 final custody order. To the extent that there was a material inconsistency between Father's assertions and the actual facts, that could have been a valid basis for questioning Father's credibility, but perjury by Father was not established. The court has not "ignored" Mother. Even murderers on death row have more contact

6

with their children than Father has had in this case in the last two years. The December 22, 2017 Order included supervised visitation without additional reunification counseling only because Mother repeatedly interfered with and harassed every counselor who had been selected by the parties or appointed by the court to conduct reunification counseling.

3. **Father was/is indicated through CYS during this proceeding. Father committed perjury again stating with his then present attorney James Geibig that Father had successful completion of a safety action with a misstated letter; the letter was later rectified but the proceedings never ceased. This perjury committed by Father and the court's not verifying what Father claimed and CYS not ensuring R        's safety has put the courts and CYS in peril as R        has been placed in unsafe conditions with her perpetrate Father.**

Father admitted "flicking" his daughter in the head with his finger prior to the suspension of his partial custody rights in February of 2016. He acknowledged that he pulled her hair also. When asked whether he ever threatened to kill his daughter he said that if he did, it was in a kidding non-serious way. In fact, when the flicking and hair pulling was reported, they were the lead allegations, with the allegation of death threats being an afterthought that was first disclosed to the court over a year later. Attorney Webster, who filed the Emergency Motion, is well-respected and thorough, and it is impossible to believe that he was told of death threats but neglected to list such threats in the Emergency Motion. In retrospect, the undersigned should not have suspended Father's partial custody rights—even though thought to be just a short-term temporary suspension at the time—without an immediate hearing. It was that initial suspension that has allowed the parental alienation to grow and blossom.

As far as the procedural history of the CYS dependency proceedings are concerned, the court was informed that Mother's complaint against Father was

7

ultimately determined on administrative appeal to be "unfounded," but that Mother has appealed that finding to the Commonwealth Court, and a decision has been in process for well over a year. No current documentation of that assertion has been provided on this record. Typically, almost all of the information about the CYS dependency proceedings was provided by unsworn statements or inadmissible hearsay. Some documents were made exhibits.

**4. Dan Webster filed for a *de novo* hearing without the knowledge of Mother that the past very important variables were now going to just start new with the request of a *de novo*.**

The undersigned does not actually understand this particular ground. As mentioned above, Daniel Webster is an attorney that represented Mother briefly at the time of the initial court contact in this case. At that time, there was an agreement to arrange family reunification counseling and/or to obtain a professional consultation as to the best way to proceed. That agreement was reached in an off-the-record conference on August 29, 2016. One of Mother's repeated complaints is that the undersigned has refused to furnish a transcript of that conference, but it is impossible to do so, as no recording was made and no stenographer was present. Neither of the attorneys requested that any portion of the discussions be placed "on the record." Had a stenographer been requested, one was readily available and would have appeared within five minutes. In the course of the discussions, Mother and her counsel agreed to a specific named counselor, but a day or two later, Mother changed her mind. She objected to the use of a very competent psychologist on the basis of her claim that the counselor had a conflict of interest as having counseled Mother in the past. In fact, Mother was confused (Molchan was the psychologist agreed upon, Mucha was the one Mother had counseled

8

with), and there was no actual conflict. However, once that issue was resolved, the agreed upon counselor refused to work in the extremely hostile environment of this case. Several other counselors have since done the same.

> 5. Krupa filed contempt's on 8/22/2016 before the scheduled custody trial where her client was doing no show no calls to the supervised visits at the center.

The undersigned is unable to make a reasoned response to this, as it appears to be a statement without an assertion of error. At one of the hearings, Father explained one missed visit on his part, while pointing out that all of the other visitations were frustrated by Mother's actions.

> 6. 8/29/2016 Trial held where Judge Leskinen made biased, intimidating, comments to Mother stating that he was going to be a bull in Mother's china shop and in reference to Father that "farmer's kids are good kids." The Judge had talked with B H (grandfather of Father) before the trial commenced. Leskinen placed an order of family counseling that neither party agreed upon. But the Judge, holding true to his word, as he would not place a custody agreement but placed an order that was not discussed in the trial that day and Mother was supposed to figure this out with dad the Father was abusing R and drinking and driving with her while threatening to kill her that the Judge was aware of Father's conduct stated to Webster (Father's present attorney) at the trial that well "boys will be boys." Leskinen limited Mother's access to the courts this day as he told her to leave and not come back, while he violated her due process rights. Violating Chapter 33 Rule 115 recording and transcribing, Rule 2.3 bias and prejudice, and the right to be heard 2.6

August 29, 2016 was scheduled for a full day custody trial. Before trial began, the court met with the parties to see if there could be any factual stipulations or legal issues agreed upon, or whether the entire dispute could be settled. During that off-the-record meeting, the undersigned did use an analogy that this court has used many times, approximately as follows: "You two are the parents of this child, and are the people with the most expertise in the world on what this child needs. You two are capable of doing a

9

much better job of dividing up custody of this child than a court can possibly do. Schedules change on a daily basis, and no court order can possibly deal with all the unpredictable events that will occur. I will do the very best I can, but a judge is like a bull in the china shop, and you folks can do a better job of protecting your china than the judge can." Mother asserted that she is the only one who should be able to dictate the child's custodial arrangements, and she evidently believes that the above analogy was directed only at her. It clearly was not.

The undersigned has no recollection of "B᠎ H᠎    ," who he is, and would not know whether or not he ever appeared in the courtroom. The undersigned has stated in various contexts that children who grow up on a farm tend to be good kids, and may have made a statement to that effect in Mother's presence. That acknowledged, the undersigned is not aware of who is or who is not a farmer in this case—and a prejudice in favor of farmers in general or to Father's grandfather in particular has played no part in any decision in this case. Notably, Mother continues to maintain primary physical custody of this child, and all this court has ordered to date is counseling, reunification counseling, supervised visitation and supervised partial custody with Father.

Contrary to Mother's statements, both sides agreed to accept counseling, and the scheduled hearing was continued as a result. The undersigned recalls making no statement as to: "boys will be boys." Moreover, the undersigned specifically did not make any such statement in reference to drinking and driving with a child in the car. As noted above, the claim that Father seriously threatened to kill the child was not made until the child actually testified in 2017, and was found to be incredible. Moreover, there

10

was never any testimony that Father made such a threat while driving. The undersigned never told Mother to "leave and not come back."

7. 9/23/2016 Mother forced to have Kate Vozar (Judge Wagner, the same Judge that dropped charges for R⸱ H⸱ ⸱ ⸱, Father's uncle, son of B⸱ H⸱ , pap was facing a felony) as a counselor or else be held in contempt based on 8/29/2016 trial that commenced off record.

The undersigned has no knowledge of R⸱ ⸱ H⸱ ⸱, any charges lodged against him, or any dismissal of same. After Mother refused to use any other qualified counselor, Kate Vozar became one of the many counselors who attempted reunification counseling that was frustrated by Mother's refusal to cooperate and her disruptive and harassing conduct. Kate Vozar is a licensed counselor who regularly provides such counseling. While she is the step-daughter of Fayette County President Judge John F. Wagner, Jr., she was not chosen for her relationship to a member of the court, but because she was the only licensed counselor that was willing to attempt to help at that time.

8. Charity Kruppa took R⸱ 's child support off domestic relations in the form of Father's income tax return that was payment owed to R⸱ for Father's arrears. R⸱ has yet to be compensated for Kruppa's theft.

The undersigned is unable to make a reasoned response to this without further explanation of the complaint. What is referenced may be at the Domestic Relations case docket number. When faced with "parental alienation syndrome," it has been suggested at several judicial seminars that one appropriate remedy is to make the offending parent pay the cost of counseling and attorney's fees needed to deal with the syndrome. An efficient way to collect that debt is through credits against child support payments. There certainly has been no "theft" of money by anyone in this case.

9. 10/2016 Orders placed to enter exhibits. The Prothonotary does not enter

11

these until 3/2017 showing that there was no contempt on Mother. Holding them until a year later.

The undersigned is unable to make a reasoned response to this, as it appears to be a statement without an assertion of error. The date exhibits were filed with the Prothonotary does not have any relationship with whether Mother committed contempt of court.

10. On 3/15/2017 two orders were placed on a day where there were no court proceedings of any kind along with no motion on the orders that were placed for Judge to grant or deny. On 3/16/2017 there was one motion that was presented and ruled on Judge Leskinen sent all order out on 3/16/2017, two being ordered on 3/15/2017.

The undersigned is unable to make a reasoned response to this, as it appears to be a statement without an assertion of error.

11. 4/19/2017 Custody trial commenced, R⸱          ⸱ testified in the presence of Kelvin Morris where R⸱          stated that Father had drank and drove with her and threatened to kill her. Leskinen called R⸱          a liar. This trial is not listed on civil print but there was an Order placed this day for more counseling with Vozar, the Judge dated it 5/4/2017 which was another lie as it was produced from the 4/19/2017 trial.

The undersigned did find the child's assertion of a death threat to be incredible based on the fact that the assertion did not appear in the initial Emergency Motion. Up to that moment, the court was informed that the complaints against Father were that he had "flicked" the child and pulled her hair, and that she had anxiety about being in his custody. Logically, a genuine death threat should have been the priority complaint and not something concealed from the court until over a year later. See the "Emergency Motion to Modify Order of Custody filed by Mother's then counsel on February 10, 2016. The fact that numerous allegations adverse to Father were set forth in that Motion, but claims of a death threat were notably absent, was the principal reason the undersigned was convinced that the claim of a death threat was fabricated. The undersigned is still

12

convinced that the "death threat" was either suggested entirely by Mother or, at best, that Father made a mocking non-serious threat that Mother has inflamed and exaggerated through the suggestibility of this child.

The undersigned does not understand the assertion that the Order entered on May 4, 2017 "was another lie" because it followed the hearing on April 19, 2017.

12. 6/1/2017 Another custody trial that turned into a motions court. Once again Leskinen denied Mother and R    , access to the courts and violated their due process.

The undersigned is unable to make a reasoned response to this, as it appears to be a statement without a specific assertion of error. As noted above, there is no transcript of what occurred on that date, but there were a number of Motions that were dealt with on that date, and to the best of the undersigned's recollection, the matter was delayed at Mother's counsel's request so that the psychological examinations she requested could be performed. Access to the courts was not and has never been denied.

13. 6/23/2017 Leskinen once again enters Kate Vozar's notes into an order along with an email from Kelvin Morris that was given to Leskinen from Vozar. Violating Mother's privacy with her attorney. Kate Vozar also never testified on the notes or Kelvin for his email.

The undersigned is unable to make a reasoned response to this, as it appears to be a statement without an assertion of error. In the absence of transcripts, it is impossible to reconstruct who presented the currently questioned documents.

14. 8/17/2017 Leskinen placed contempt on Mother's right in motions court not giving Mother an evidentiary hearing.

Mother's history of defiance was well-known to the court at the time she was held in contempt in Motions Court. The Motions Court certificate indicated that she had been served, so she had the opportunity to appear and defend.

13

**15. 8/24/2017 Kruppa files more contempt's; 10/24/2017 order placed for hearing this day.**

The undersigned is unable to make a reasoned response to this, as it appears to be a statement without an assertion of error.

**16. 10/24/2017 Kruppa tampered with a witness in court this day and would not allow Carrie Moxley to testify and fulfill the subpoena.**

There was no tampering with any witness, and this assertion is nonsense. Again, a transcript is necessary to make any attempt to reconstruct what, if anything, occurred with respect to Carrie Moxley.

**17. 11/3/2017 Leskinen made Mother have an attorney with her for the remaining of the case. Doug Sepic never entered his appearance along with not representing Mother to the fullest in requests that Mother had brought to attention.**

Because there were various contempt petitions pending, Mother was entitled to have counsel represent her. The orders filed by the undersigned were designed to inform her of the importance of having counsel. Had she not obtained her own counsel, the undersigned would have appointed counsel for her because incarceration was a sanction requested by Father's counsel. Mother did obtain her own counsel, and he appeared with her and did a very creditable job. The undersigned was unaware that he had not filed a written appearance, but assumed that he had. He did represent her with no contemporaneous objection by her or by anyone else. He successfully defended Mother from the bulk of the contempt allegations. He submitted a written proposed order that was used in formulating the final custody order. Mother again changed her mind a few days later.

**18. 11/14/2017 Leskinen violated R⸱ ⸱'s privacy and demanded that Angela Valanskey testify (R⸱ ⸱'s private counselor) once again interfering with**

14

the abused child's mental health.

There was no invasion of privacy or interference with the child's mental health by permitting the witness (Vaslavsky) to testify. Mother's irrational attitude and unyielding resistance to any reasonable contact between the child and her Father is what is interfering with R⸱    's mental health. Again, a transcript is necessary in order to further respond to this complaint.

19. Leskinen crossed custody contempt and child support, which is not a contempt remedy, see *Everett v Parker*, 889 A.2d 264 (Pa. Super. Ct. 2013). While violating Mother's due process rights 1915.2 in yet another trial Judge Leskinen did not allow Mother to enter supporting exhibits in testimony or for Mother to Cross Father, the perpetrated father. Dr. Metha, the child psychologist, and Carrie Moxley did not fulfill the subpoena and Judge Leskinen allowed it not holding either in contempt of court. Judge Leskinen had no law clerk there nor sonographer, Kathy Goodwin took notes by hand on a note pad while a guard watched the door not allowing anyone to access the courtroom. Judge Leskinen placed an order this day and then placed another one on 12/22/2017 (there was no proceeding of any kind this day). Michelle Kelly, the assigned GAL by Judge Leskinen additional to Harper GAL only met with the child one time. She never met with any third parties or provided the court nor Mother and Father with a report on what her recommendation was. R⸱    was not a ward of the state and Mother having full custody rights yet again Judge Leskinen violating Mother's rights.

It is unclear what the exact complaint is here. Mother's contempt of previous orders was established beyond doubt. Financial sanctions for contempt were completely appropriate. Crediting those financial sanctions against child support appeared to be an efficient and fair way to collect and to insure that incarceration for a willful refusal to pay would not be necessary. To the extent a credit against child support was actually taken would have to be within the files of the Domestic Relations Section. No incarceration has been imposed up to this time. A transcript is necessary in order to speak to the other assertions of error, and the undersigned did not violate Mother's due process

15

rights, did not refuse properly offered exhibits, and does not recall being asked to enforce subpoenas for Carrie Moxley or Dr. Ravindra Mehta after any proffer of admissible testimony was made. In addition, the claim that "a guard watched the door not allowing anyone to access the courtroom" absolutely did not occur. (The Courtroom has three entrances, plus a bridge from the County Prison.) Both the Guardian Ad Litem and the attorney appointed for the child were, and continue to be, anxious to meet with R        –without Mother sitting in and observing and coaching her behavior and responses. Mother does not have "full custody rights," but she still has primary physical custody. This whole proceeding is occurring because Father has custodial rights that have been seriously hampered and infringed by Mother's words and actions, including her false claim that Father seriously threatened to kill the child.

20. **1/18/2017 Motions were ruled on after Mother appealed this to the Superior Court stating that Mother's motions were denied in reference to Dr. Metha and Carrie Moxley not fulfilling the subpoenas. Michelle Kelly and Harper committing negligence in representing        ... Placing yet another contempt on Mother in motions court for Mother to pay Charity Kruppa. Judge Leskinen also stated that Mother was not in court this day Mother filed a routine motion any other motions that Mother had petitioned Judge Leskinen would not show on the bench that day and Mother always was not allowed to talk. Judge George had filled in along with Cappuzzi**

The undersigned is unable to make a reasoned response to this run-on assertion of error. Mother did present some motions relative to the subpoenas listing Dr. Metha (sic) and Father's previous girlfriend, Carrie Moxley. The relief contained in the proposed orders she attached was to transfer the entire case to Westmoreland County, where neither party resides, and to hold the child's counsel to be ineffective. Both motions were presented after the final order was entered, after the hearings were concluded. Neither motion indicated that the proposed witness had been served with

16

the subpoena, and neither motion requested a hearing date for the proposed witnesses' testimony to be heard. Mother's words and actions have repeatedly brought this action to a standstill. She has sabotaged and frustrated every attempt at reunification counseling and supervised visitation. It is the opinion of the undersigned that her actions in that regard must either be deliberately malicious, or the result of some behavioral health disorder. At one point, Mother petitioned for and was granted the right to obtain mental health evaluations of all parties. Months later she acknowledged that she could not afford to pay for the evaluations. Mother has interfered with every counselor who has attempted to reunify the child with her Father, and has prevented virtually every court-ordered supervised visitation. Most recently, with the instant appeal, she is renouncing the December 22, 2017 order that was entered with the active participation of her counsel, Douglas Sepic, Esq., by retroactively disavowing his representation.

21. **2/1/2018 Charity Kruppa is dismissed and removed Prothonotary is to delete Kruppa's appearance from the case. Mother was not provided with a motion to present that Kruppa petitioned to withdraw her appearance from the case.**

Charity Grimm Krupa, Esq. did withdraw her appearance. She did so because Father became unable to honor his fee agreement with her, which was substantially in arrears. She was required to notify all parties, although it is unclear what valid objection another party could possibly have. The undersigned does not recall that this objection was ever preserved by making an appropriate motion or otherwise.

BY THE COURT:

_____
STEVE P. LESKINEN

ATTEST:

Nina Capuzzi Frankhouser

_____
PROTHONOTARY

17

# IN THE COURT OF COMMON PLEAS OF
## FAYETTE COUNTY, PENNSYLVANIA

J.       S'.                    ,          : CIVIL ACTION

          Petitioner/Appellant,           :

     v.                                   : CASE NO. 492 of 2018, G.D.

T'       S'           ',                   :

          Respondent/Appellee.            : JUDGE JOSEPH M. GEORGE, JR.

# OPINION

GEORGE, J.                                          June 18 , 2018

J:       S:        appeals from the Order dated March 21, 2018 which denied a protection from abuse petition which Appellant filed on behalf of the minor child, R₁        F₁        -S    '. This Opinion is in support of the order denying said petition.

## Facts

On Wednesday, March 21, 2018, this Court denied a temporary protection from abuse ("PFA") order filed by Appellant, J.       S         ., on behalf of the minor child, R        F.       -S₁    :. Appellant resides at       Isabella Road, Connellsville, Fayette County, Pennsylvania. Appellee also resides in Connellsville, Fayette County, Pennsylvania. Service of the temporary order and notice of hearing had been perfected as of the date of the hearing as Appellee and his counsel were present. Accordingly, the Court conducted the hearing on Wednesday, March 21, 2018 at 10:50 a.m. In this hearing, Appellant has cited words of the Appellee allegedly directed to the minor child in which Appellee states that he was going to

1

"come at her (minor child) hard". *Trial Transcript, pg. 5.* This conversation allegedly took place on March 5, 2018 and was Appellant's basis for filing a PFA.

## Issues Presented

Appellant, acting *pro se*, has asserted no less than five (5) issues:

1. Whether the severity of the request for a PFA was minimized while the focus was on custody;

2. Whether the Court should have considered a psychological evaluation performed on the minor child;

3. Whether the Court should have considered the fact that Appellee has been indicated by CYS;

4. Whether the Court should have considered Appellee's traumatic brain injury as a factor;

5. Whether the Court should have considered the alleged criminal history of Appellee.

## Discussion

The asserted errors lack merit. On the first issue, Appellant contends, in essence, that the Court turned too much focus on Custody and not on Abuse. However, it was apparent that Appellant made veiled attempt to substitute the PFA proceeding to interfere with Appellee's custody/visitation rights under the recently entered, existing custody order. The purpose of the Protection from Abuse Act *23 Pa. C.S.A. §6101 et seq.*, is to protect the victims of domestic violence from the perpetrators of the same. *See Fonner v. Fonner 731 A. 2d 160 (Pa. Super 1999).*

Appellant cites *Lawrence v. Bordner, 907 A. 2d 1109 (Pa. Super. 2006)*, to provide support for her claim that the focus of the PFA hearing was incorrectly on custody and not abuse. *Bordner* reiterates the position of this Court that the

2

primary focus and goal of a PFA hearing is to determine abuse and protect the alleged victim from the same, and not a thinly veiled means to circumvent a custody order. The Pennsylvania Superior Court has further stated that the right of the trial court to award temporary custody and to establish temporary visitation rights with regard to minor children was intended to provide ancillary relief regarding minor children in abuse actions but not to establish a procedure for determining permanent custody. *See Rosenberg v. Rosenberg, 350 Pa. Super 268 (1986)*.

In light of this established case law, this Court determines that Appellant's first issue lacks merit. Appellant has failed to show that Appellee meant to in any way harm, or instill the fear of any harm, to the minor child with Appellee's statement. In fact, when asked by the Court during an *in camera* direct examination, the minor child indicated that she believed Appellee's statement to mean that he intended to keep trying hard to see her until she was 18. *Trial Transcript, pg. 15-16*. This court holds that Appellant has failed to demonstrate abuse or threats thereof, made by Appellee; but rather, that Appellant is seeking to use the PFA order as a means of circumventing the existing custody order and not as a means of protecting the minor child from current of future abuse.

Additionally, Appellant's second, third, fourth[1], and fifth issues were not raised at the hearing. As such, these issues have been waived and are not appropriate on appeal.

---

[1] Assuming that this issue is not waived, the issue of alleged traumatic brain injury is irrelevant, as the purpose of the act is prevention of abuse. No evidence was presented to show that the alleged traumatic brain injury is causing Appellee to perpetrate any abuse. *See Snyder v. Snyder, 427 Pa. Super. 494 (Pa. Super 1993)*. See also *Eichenlaub v. Eichenlaub, 340 Pa. Super 552 (Pa. Super 1985)*.

3

Wherefore, it is submitted that this appeal is without merit and should be dismissed.

ATTEST:

*Nina Caruzzi Franchoun*

PROTHONOTARY

BY THE COURT:

_____,J.
JOSEPH M. GEORGE, JR., JUDGE