J-A14028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENNETH J. COLE | : | |
| | : | |
| Appellant | : | No. 156 EDA 2023 |

Appeal from the Judgment of Sentence Entered July 15, 2022
In the Court of Common Pleas of Chester County
Criminal Division at No: CP-15-CR-0003724-2019

BEFORE: LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY STABILE, J.:                    **FILED SEPTEMBER 25, 2024**

Appellant, Kenneth J. Cole, appeals from the judgment of sentence imposed on July 15, 2022, as made final by the denial of his post-sentence motion on December 13, 2022. He challenges the sufficiency and weight of the evidence to support his convictions of endangering the welfare of children, resisting arrest and summary harassment. Concluding Appellant's claims to be waived, as well as meritless, we affirm.

On May 23, 2019, Nicole Gantt was sleeping in bed with her minor daughter when her husband, Appellant, came home drunk. N.T., 8/31/21, at 40-41. Appellant woke up Ms. Gantt by slapping her buttocks and using profanity in the presence of the child to get out of bed. *Id.* Initially, Ms. Gantt and her daughter got up and went into a different room. *Id.* at 41. Ms. Gantt went back into the bedroom to retrieve her cell phone, and an argument ensued between her and Appellant. *Id.* Appellant, who had been sitting on

the bed, jumped up and hit Ms. Gantt, who defended herself. *Id.* Appellant punched her in the "head, face, everywhere." *Id.* at 42. Ms. Gantt estimated that Appellant punched her six or seven times, but she was unsure of the exact number. *Id.* While Ms. Gantt was on the ground, Appellant "was standing over top of [her and] just came down with his one knee into [her] ribs." *Id.*

Ms. Gantt called 911.[1] *Id.* She informed dispatch that Appellant struck her repeatedly, and that her ribs were possibly broken. *Id.*, at Exhibit C-2. She was unsure if there were weapons in the home and reported that she believed Appellant was intoxicated. *Id.* While Ms. Gantt was on the phone with the 911 operator, a responding officer arrived at the home. *Id.*

Officer Michael Kinsman of the City of Coatesville Police Department was dispatched to Appellant's residence, and he arrived about two minutes after Ms. Gantt called 911.[2] N.T., 9/1/21, at 5, 8-9. Before he exited his vehicle, the dispatch was upgraded to an assault with injuries based on the 911 call from Ms. Gantt. *Id.* at 9-10.

When Officer Kinsman knocked on the door, he could hear Ms. Gantt on the phone with the 911 operator. *Id.* at 12. The officer observed that Ms. Gantt was visibly distressed and that it was painful for her to walk. *Id.* She

---

[1] The 911 call was admitted into evidence at trial. N.T., 8/31/21, at 49.

[2] A neighbor of the adjoining duplex had also called 911 to report a domestic disturbance. N.T., 9/1/21, at 7-8.

held her cell phone in one hand and clutched the left side of her upper torso with the other. *Id.*

Ms. Gantt informed Officer Kinsman that Appellant had violently assaulted her. *Id.* at 13. Officer Kinsman was only partially able to see inside the home, so he asked Ms. Gantt to step outside for her safety as Appellant was still inside, standing at the top of the stairs to the second floor. *Id.* at 13-14. As Ms. Gantt stepped out, Appellant ran down the stairs "very aggressively," only stopping at the front door, within feet of Officer Kinsman and Ms. Gantt. *Id.* at 14-15. Officer Kinsman believed Appellant intended to attack him or Ms. Gantt, and Appellant was directed to back away. *Id.* When Appellant did not comply, Officer Kinsman unholstered his firearm and pointed it at Appellant. *Id.*

Officer Kinsman continued to command Appellant to show his hands, as it was difficult for the officer to see what, if anything, Appellant was holding. *Id.* at 16. Appellant ignored the order and instead ran to the front door, pushed it shut and tried to lock it. *Id.* Officer Kinsman kicked the door open because it had been reported that children were in the home, and he wanted to ensure their safety. *Id.* at 16-17. As the door was kicked, the glass in the top half of its windowpane shattered. *Id.* at 17-18.

Around this time, Officer Samuel Snyder arrived at the home. N.T., 8/31/21, at 57. When he saw Officer Kinsman draw his firearm, Officer Snyder did so too, but he did not point it at Appellant. *Id.* at 57-58. As Officers Kinsman and Snyder entered the home, Appellant fled upstairs. *Id.* at 58.

- 3 -

Officer Snyder put his firearm away and drew his taser to ensure the officers had a non-lethal option. *Id.* at 58-59.

Once inside the home, Officers Kinsman and Snyder observed Appellant standing at the top of the stairs holding his minor son, K.C., in front of him. *Id.* at 59. Appellant seemed angry, and he demanded to know why officers were in the home. *Id.* at 60. From the bottom of the stairs, the officers continued to yell commands at Appellant to show his hands and release K.C. *Id.* Ms. Gantt, who was downstairs behind the officers, and the parties' minor daughter who was upstairs, were also yelling at Appellant to let K.C. go. *Id.* at 61-62. Appellant was yelling at the minor daughter to record what was happening. *Id.* at 62.

Throughout this entire encounter, Officer Kinsman had his firearm, and Officer Snyder had his taser, pointed at Appellant. *Id.* at 65. The taser held by Officer Snyder emitted a targeting laser, and when K.C. saw the laser on Appellant, the child began screaming. *Id.* Shortly thereafter, Appellant released K.C., who then moved away from Appellant. *Id.*

Two more officers then arrived at the home – Corporal Jared Davis[3] and Lieutenant Kenneth Michaels.[4] Appellant started to come down the stairs after Corporal Davis commanded him to, and when he was about halfway down the stairs, the officers ordered him to get on the ground. *Id.* at 67. Appellant

---

[3] Davis' title was "Officer" at the time of the incident. N.T., 8/31/21, at 66.

[4] Michaels' title was "Corporal" at the time of the incident. *Id.*

refused and retreated back to the top of the steps. *Id.* Once it was determined that Appellant was not armed with a weapon, the officers decided to go upstairs to attempt to detain him. *Id.* at 69.

Officer Snyder was the first up the stairs and upon reaching the landing, he forcefully shoved Appellant backwards. *Id.* Appellant thrashed around and yelled for his children to record what was happening. *Id.* at 70. "Eventually [Appellant] curled up with his hands up underneath his body as he laid sort of facedown and was holding them tight to his chest to prevent us from pulling his hands out so that he could be placed in handcuffs." *Id.* Officer Kinsman stunned Appellant using the drive stun feature. N.T., 9/1/21, at 38. However, Appellant was not subdued, as he was able to grab the taser, pull it away from his body, and strike Lieutenant Michaels with it. *Id.*

The police managed to handcuff Appellant, and during the struggle, he was thrashing, kicking, yelling and telling his children to record him. N.T., 8/31/21, at 72. As soon as the handcuffs were secured, Appellant "went limp and just laid there." *Id.* at 72. Officers moved Appellant onto his side into a recovery position, and eventually to a seated position. *Id.* at 72-73. Once he was placed in a seated position, Appellant appeared to be unconscious. *Id.* at 73.

Emergency medical services ("EMS") were nearby when the responding officers called for assistance, and they responded almost immediately. N.T., 9/1/21, at 48. An emergency medical technician, Kevin Collette arrived to render aid, and when he did so, he observed Appellant in a seated position

with his hands behind his back. *Id.* at 49. There was some blood on Appellant's face, and he refused to answer any questions. *Id.* EMS checked and confirmed Appellant had a very strong pulse and he did not appear to be suffering from any major medical issue. N.T., 8/31/21, at 74. Appellant was merely not responding. *Id.* Mr. Collette testified that he did not believe Appellant was unconscious because "he responded by opening his eyes and looking around on occasion." N.T., 9/1/21, at 49. Had he believed Appellant lost consciousness, he would have requested a medic per protocol. *Id.* at 49-50.

Officers requested EMS to bring a stair chair, which is a device used to transport a patient downstairs. *Id.* at 48. When officers and EMS attempted to put Appellant on the stair chair, he went stiff, preventing him from being secured in the device. *Id.* at 49. Once it became clear that EMS could not utilize the stair chair safely, a Reeves stretcher was brought in. *Id.* at 50. A Reeves stretcher is "a large orange flexible stretcher. It enables [EMS] to strap patients in using three straps. It's got flaps on either end to hold the patient in and secure their head. It's got board slats that go down the length of the stretcher to keep it firm." *Id.* "It also enables [EMS] to slide the patient on hard surfaces and makes it a little easier for getting people out." *Id.* (Cleaned up).

Once Appellant was secured in the Reeves stretcher, he again yelled at his children to record, and rolled his body around while officers and EMS

carried him downstairs. *Id.* at 75. While being carried downstairs, Appellant was yelling, and blood was spraying all over. N.T., 9/1/21, at 53.

When they got to the first floor, Appellant "essentially rolled out of the Reeves [stretcher]." N.T., 8/31/21, at 76. Appellant was asked to stand up and walk on his own, but he refused and continued to yell for his children to record the incident. *Id.* Officer Snyder, Lieutenant Michaels, and another individual had to pick Appellant up and carry him through the front door. *Id.* In doing so, Officer Snyder's arm was cut by the broken glass from when Officer Kinsman broke the door open. *Id.* at 76-77. Officer Snyder had a four-inch, U-shaped laceration that required eight stitches to close the wound. *Id.* at 77.

After EMS tended to Officer Snyder, they put Appellant back on the Reeves stretcher because he was still kicking and thrashing. N.T., 9/1/21, at 53. Eventually, they were able to get Appellant into the ambulance, and an officer placed leg shackles on him. *Id.* at 53-54. Officer Kinsman accompanied Appellant to the hospital, where he declined treatment. *Id.* at 25. Thereafter, Lieutenant Michaels arrived at the hospital to transport Appellant to the police station. *Id.* Appellant's hospital bed was wheeled out to the police car, but Appellant refused to get in because he claimed he would not fit. *Id.* at 26. Officer Kinsman re-handcuffed Appellant in front of his body, and Appellant got into the back of the vehicle unassisted. *Id.* at 26.

Once at the police station, Appellant exited the vehicle, walked inside and sat on a bench unassisted. *Id.* at 26. "The only thing that delayed or

altered his movements was simply the fact that he was wearing shackles."
***Id.*** This occurred approximately one and a half hours after Appellant was placed in the ambulance on the Reeves stretcher. ***Id.*** at 27.

The entire incident – from when Officer Kinsman first arrived on scene until Appellant arrived at the police station – was recorded on the officers' body worn cameras.[5] ***See*** N.T., 8/31/21, at 80-81; N.T, 9/1/21, at 28. Appellant was arrested and charged with nine counts of aggravated assault, endangering the welfare of children ("EWOC"), simple assault, six counts of recklessly endangering another person ("REAP"), resisting arrest, unlawful restraint and five counts of summary harassment. The case proceeded to a jury trial on EWOC, simple assault, six counts of REAP, and resisting arrest, where the above facts were adduced.

At the end of the trial, the jury found Appellant guilty of EWOC and resisting arrest, and not guilty of simple assault and all six counts of REAP. The trial court found Appellant guilty on the five counts of summary harassment.

On July 15, 2022, Appellant was sentenced to an aggregate term of eighteen to thirty-six months of incarceration, consecutive to his sentence at an unrelated docket. On July 21, 2022, Appellant filed a timely post-sentence motion. On July 27, 2022, the trial court ordered the parties to brief the motion within thirty days. Thereafter, on August 29, 2022, the trial court

_____

[5] Portions of the recordings from the body worn cameras were played at trial.

granted Appellant's request for a sixty-day extension of the briefing deadline, and a thirty-day extension of time under Rule of Criminal Procedure 720(B)(3)(b) for the trial court to decide the motion before it is denied by operation of law.[6]

The trial court denied Appellant's post-sentence motion on December 13, 2022. This timely appeal followed. Both the trial court and Appellant have complied with Pa.R.A.P. 1925. Appellant raises the following issues for our review:

1. Whether the trial court erred in denying Appellant's Motion to Suppress based upon the police's unlawful entry into Appellant's home[.]

2. Whether the evidence presented at trial was legally insufficient to support the jury's verdict and the trial court's summary verdict[.]

3. Whether the jury's verdict and the trial court's summary verdict were against the weight of the evidence, requiring a new trial [.]

Appellant's Brief at 8.

Appellant first challenges the denial of his motion to suppress. We conclude this issue waived as Appellant has failed to provide us a full and complete record, specifically, the transcript of the suppression hearing. "The fundamental tool for appellate review is the official record of what happened

_____

[6] Generally, the trial court has 120 days to rule on a post sentence motion before it is denied by operation of law. Pa.R.Crim.P. 720(B)(3)(a). However, the trial court "may grant one 30-day extension for decision on the motion" upon good cause. Pa.R.Crim.P. 720(B)(3)(b).

at trial, and appellate courts are limited to considering only those facts that have been duly certified in the record on appeal." ***Commonwealth v. Williams***, 715 A.2d 1101, 1103 (Pa. 1998). "To ensure that the appellate courts have all necessary records, the Pennsylvania Rules of Appellate Procedure provide for the transmission of certified records from trial courts to appellate courts." ***Id.***

Rule 1911 of the Pennsylvania Rules of Appellate Procedure requires appellants to order any transcripts necessary to complete the records for their appeals, and provides as follows:

> (a) **General Rule**.  The appellant shall request any transcript required under this chapter in the manner and make any necessary payment or deposit therefor in the amount and within the time prescribed by Rules 4001 *et seq.* of the Pennsylvania Rules of Judicial Administration
>
> * * * *
>
> (d) **Effect of failure to comply**.  If the appellant fails to take the action required by these rules and the Pennsylvania Rules of Judicial Administration for the preparation of the transcript, the appellate court may take such action as it deems appropriate, which may include dismissal of the appeal.

Pa.R.A.P. 1911.  Thus, "[w]hen the appellant . . . fails to conform to the requirements of Rule 1911, any claims that cannot be resolved in the absence of the necessary transcript or transcripts must be deemed waived for the purpose of appellate review." ***Commonwealth v. Preston***, 904 A.2d 1, 7 (Pa. Super. 2006), *appeal denied*, 916 A.2d 632 (Pa. 2007).

When examining the ruling of a motion to suppress, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing." ***Commonwealth v. Harlan***, 208 A.3d 497, 499 (Pa. Super. 2019) (citation omitted). Here, there is no indication on the docket that a request for the transcript of the suppression hearing was ever filed. Without the benefit of that transcript, this Court cannot conduct a meaningful review of the issue. Therefore, we conclude that Appellant's first issue is waived.[7]

In his second issue, Appellant challenges the sufficiency of the evidence to support his convictions of EWOC, resisting arrest and summary harassment. Our standard of review is:

> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

---

[7] The trial court determined Appellant's suppression issue was waived for the same reason. ***See*** Trial Court Opinion, 3/15/23, at 52-54.

- 11 -

***Commonwealth v. Brown***, 23 A.3d 544, 559-60 (Pa. Super. 2011) (*en banc*) (internal citations omitted).

"In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." ***Commonwealth v. Freeman***, 128 A.3d 1231, 1248 (Pa. Super. 2015). "Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." ***Id.*** When an appellant fails to identify the specific elements of the specific crimes that are being challenged in a 1925(b) statement, the issue is waived. ***Id.***; ***see also Commonwealth v. Bonnett***, 239 A.3d 1096, 1106-07 (Pa. Super. 2020), *appeal denied*, 250 A.3d 468 (Pa. 2021) (finding waiver due to a blanket statement in the Rule 1925(b) statement that there was "insufficient evidence to sustain a verdict of guilty of each charge in each case").

Here, Appellant's 1925(b) statement of errors includes the following claims:

1. The evidence presented at trial was legally insufficient to support the jury's verdict.

2. The evidence presented at trial was legally insufficient to support the summary convictions of harassment.

Appellant's Concise Statement, 1/26/23, at ¶¶ 1-2. These boilerplate, conclusory statements are deficient as a matter of law to preserve a

- 12 -

sufficiency challenge for appellate review. Appellant was convicted of three different offenses, but he has failed to identify the specific element of each offense that he believed was not supported by sufficient evidence. Instead, he has simply objected to the sufficiency of "the jury's verdict" and "summary convictions of harassment," assertions that were no more specific than the sufficiency claims we found waived in **Bonnett.** Accordingly, we hold that Appellant has waived his challenge to the sufficiency of the evidence.

Even if the sufficiency claims were not waived, Appellant would not be entitled to relief for the reasons given by the trial court in its 1925(a) opinion. **See** Trial Court Opinion, 3/15/23, at 43-49. The trial court found that the Commonwealth presented sufficient evidence to support the EWOC conviction because Appellant had a duty to protect his son, K.C., and used him as a shield for "well over a minute during which time there were both a gun and a taser pointed in their direction." **Id.** at 45. Appellant's actions "endangered both the physical and psychological welfare of his child." **Id.**

Regarding resisting arrest, the trial court found that Appellant "not only deployed passive resistance to the officers, but he also struggled with them to the point that substantial force was required to overcome [Appellant's] resistance to being taken into custody." **Id.** at 46-47. Lastly, the trial court found the harassment convictions were supported by sufficient evidence because Appellant "intended to harass, annoy, or alarm the officers by struggling with them as they attempted to take him into custody." **Id.** at 48. Moreover, "the evidence revealed that [Appellant] slapped [Ms. Gantt's]

- 13 -

buttocks, hit and tussled with her, punched her at least six times" indicating that Appellant "intended to harass, annoy, or alarm Ms. Gantt." *Id.* at 49.

Alternatively, Appellant contends that the verdicts were against the weight of the evidence. He claims that

> the jury's verdict is against the weight of the evidence based upon two fundamental inconsistencies. The first is the inconsistency between the [trial court's] summary verdict and the jury's verdict. Appellant was convicted of the harassment summaries yet acquitted of REAP on the same facts. The second inconsistency is within the jury's verdict itself. The jury convicted Appellant of endangering the welfare of children and resisting arrest, yet acquitted Appellant of [REAP]. This goes against the weight of the evidence. These staggering and irreconcilable inconsistencies shock the conscience.

Appellant's Brief at 22.

A challenge to the weight of the evidence concedes that there was sufficient evidence to sustain the verdict. *See Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000). We employ an abuse of discretion standard:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing the trial court's determination that the verdict is against the weight of the evidence.

*Id.* at 753. Additionally, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the

issue in any other meaningful fashion capable of review, that claim is waived."

***Commonwealth v. Johnson***, 985 A.2d 915, 924 (Pa. 2009).

Here, Appellant's "argument" consists only of boilerplate case law that explains our scope and standard of review for a weight of the evidence challenge. Appellant fails to make any specific argument or reference to the record. Thus, we find this claim waived.

Even if not waived, Appellant's argument fails. Our Supreme Court has held:

> While recognizing that the jury's verdict appears to be inconsistent, we refuse to inquire into or speculate upon the nature of the jury's deliberations or the rationale behind the jury's decision. Whether the jury's verdict was the result of mistake, compromise, lenity, or any other factor is not a question for [appellate courts] to review. We reaffirm that an acquittal cannot be interpreted as a specific finding in relation to some of the evidence, and that **even where two verdicts are logically inconsistent, such inconsistency alone cannot be grounds for a new trial** or for reversal.

***Commonwealth v. Miller***, 35 A.3d 1206, 1213 (Pa. 2012) (emphasis added). This reasoning applies in the present case. While the jury's acquittal of the REAP charges may have been logically inconsistent with the guilty verdicts for EWOC, such inconsistency does not warrant relief. Therefore, no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date:  9/25/2024