J-A07044-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEREMY JOSEPH MORANT | : | |
| | : | |
| Appellant | : | No. 471 MDA 2024 |

Appeal from the Judgment of Sentence Entered January 4, 2023
In the Court of Common Pleas of Lancaster County
Criminal Division at No: CP-36-CR-0000987-2022

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY STABILE, J.:                    **FILED JUNE 27, 2025**

Appellant, Jeremy Joseph Morant, appeals from the judgment of sentence imposed on January 4, 2023, by the Court of Common Pleas of Lancaster County.  He challenges the sufficiency of the evidence to support his conviction of drug delivery resulting in death.  Upon review, we affirm.

On February 20, 2021, shortly before 11:00 A.M., Officer Jonathan Werner of East Lampeter Township Police Department was dispatched to the Classic Inn on Lincoln Highway for a reported cardiac arrest.  N.T. Trial, 10/11-13/2022, at 52-53.  Upon arriving, Officer Werner went to the second floor because he heard someone crying.  *Id.* at 53.  The door to Room 33 was partially opened, so he announced himself as a police officer and went inside. *Id.*  Officer Werner saw a man, later identified as Randall Devine, performing CPR on a motionless female on the floor.  *Id.* at 54.  Officer Werner located a purse nearby and found documents that identified the female as Brittany

Zimmerman. *Id.* at 62. The coroner's office pronounced Zimmerman dead at 12:23 P.M. and noted that she had likely been deceased for less than three hours. *Id.* at 102, 105.

Gregory Root, Zimmerman's friend and the registered occupant of Room 33, testified that they were planning on checking out that day. *Id.* at 204. When Root entered Room 33 shortly before 11:00 A.M. checkout, he saw both Devine and Zimmerman slumped over and passed out with their heads on the table. *Id.* Root was unable to wake Zimmerman and moved her from the table to the floor to perform CPR. *Id.* at 204, 207. Zimmerman was blue in the face, cold and did not have a pulse. *Id.* at 207. Root, who was also a known drug user, would later testify that there were needles and heroin bags on the table, not crystal meth bags. *Id.* at 209. He explained that crystal meth typically comes in clear bags, while heroin comes in wax baggies. *Id.* The bags he saw on the table were of the latter variety. *Id.* at 210. Root then went to the front desk to ask for help. *Id.* He denied selling Zimmerman any drugs on February 19 or 20, 2021. *Id.* at 213.

The scene was then processed for evidence by Detective Preston Gentzler. *Id.* at 82. He collected a cell phone and observed drug paraphernalia, *i.e.*, small baggies, pieces of tin foil and uncapped hypodermic needles, which were not collected. *Id.* at 86, 89, 94. These items were consistent with heroin and/or fentanyl use. *Id.* at 59, 86. When Detective Gentzler examined Zimmerman's body, he discovered a frothy substance coming from her nose, as well as a hand towel or washcloth in a color similar

- 2 -

J-A07044-25

to the frothy substance, which is also consistent with an opioid death. *Id.* at 90-91, 120.

The coroner's officer conducted an external autopsy and collected Zimmerman's urine and femoral blood for testing. *Id.* at 123-24, 130. Toxicology tests revealed the presence of "amphetamine, methamphetamine, 11-Hydroxy [THC], Delta 9 THC, Delta 9 carboxy THC, Delta 9 THC, fentanyl, and Norfentanyl" in her system. *Id.* at 128. Pathologist Dr. Wayne Ross opined that Zimmerman died of acute fentanyl toxicity. *Id.* at 130. He explained that her fentanyl level was 9.1 nanograms per milliliter, "three times the lethal level that it takes to cause death." *Id.* at 132.

Detective Christopher Jones was assigned as lead investigator and in the days following Zimmerman's death, he located and downloaded surveillance videos from Classic Inn. *Id.* at 228, 231. The videos showed that Zimmerman and Devine exited Room 33 around 3:16 A.M. on February 20, 2022, left the motel and walked west on Lincoln Highway. *Id.* at 231-32. The pair returned to Classic Inn around 4:32 A.M. *Id.* at 232. To figure out where they went, Detective Jones made a list of other hotels in the area to investigate, one of which was Econo Lodge, located one mile from Classic Inn. *Id.* at 233. The surveillance videos from Econo Lodge showed Zimmerman and Devine entered one of the motel's stairways about 30 to 40 minutes after leaving Classic Inn. *Id.* at 232-33. At the same time, a male occupant of Room 212 exited and walked to the stairway that Zimmerman entered. *Id.* at 234. Zimmerman then went back down the stairs while the male returned

- 3 -

to Room 212. *Id.* This happened once more about 30 to 40 seconds later – the male left Room 212 and walked to the stairwell, and Zimmerman went up the stairwell to meet the person. *Id.* Thereafter, Zimmerman left Econo Lodge on foot with Devine. *Id.*

While reviewing additional footage from Econo Lodge, Detective Jones observed the same male leaving Room 212 on February 20, 2022, with a female, later identified as "Yameliz Alvarez," the person to whom the room was rented. *Id.* at 236. When Zimmerman's cell phone, which was recovered from the motel room, was searched, Detective Jones found Facebook messages between her and Alvarez, and between her and Appellant. *Id.* at 250.

On February 18, 2021, Zimmerman messaged Alvarez to purchase a bundle (16 bags) of fentanyl.[1] *Id.* at 158. She sent her the agreed-upon price of $80 via Cash App. *Id.* at 159. On February 19, 2021, Alvarez and Appellant drove to Philadelphia to purchase drugs for Zimmerman, as well as for their own personal use. *Id.* at 161. Appellant was aware that the bundle of fentanyl was for Zimmerman. *Id.* at 162. Alvarez continued messaging Zimmerman with updates during the trip to Philadelphia, including further discussion on Alvarez purchasing additional drugs for Zimmerman, and how she would pick them up. *Id.* at 170-73.

_____

[1] Alvarez, who was also a friend of Zimmerman, knew that she was addicted to fentanyl. *Id.* at 156.

Alvarez and Appellant returned to the Econo Lodge with the drugs in the early morning of February 20, 2021. *Id.* at 163, 175. Zimmerman was unable to find a ride to their location, so she walked from Classic Inn to Econo Lodge with Devine. Once they arrived, Zimmerman exchanged several messages with Appellant:

Zimmerman (2/20/21, 3:43 A.M.): I am here. I am about to walk to the back door. But I am with my friend, just so you know because I had to walk.

Zimmerman (2/20/21, 3:46 A.M.): I am at bottom of steps.

Zimmerman (2/20/21, 3:46 A.M.): Should I come to the top?

Appellant (2/20/21, 3:46 A.M.): No. I don't want to see nobody.

Zimmerman (2/20/21, 3:47 A.M.): Ima walk up.

Zimmerman (2/20/21, 3:48 A.M.): Is that cool?

Zimmerman (2/20/21, 3:48 A.M.): I am at top of stairs.

Appellant (2/20/21, 3:54 A.M.): I am coming.

Appellant (2/20/21, 3:55 A.M.): Come to the top.

Zimmerman (2/20/21, 3:55 A.M.): I am already here.

*Id.* at 252-54. Appellant ultimately delivered the fentanyl to Zimmerman. *Id.* at 164. When Detective Jones compared the timestamps of these messages with the surveillance videos of Appellant and Zimmerman from the Econo Lodge, the timing matched up. *Id.* at 252-53. The messages narrated what both individuals can be seen doing at specific times in the surveillance videos. *Id.*

Both Appellant and Alvarez were charged with drug delivery resulting in death ("DDRD") and conspiracy to commit DDRD. A jury convicted Appellant of both offenses, as well as the lesser included offenses of delivery of a controlled substance and conspiracy to deliver a controlled substance. Sentencing was deferred for a pre-sentence investigation. On January 4, 2023, Appellant was sentenced to an aggregate term of seven to 20 years of imprisonment.

On January 13, 2023, Appellant filed a post-sentence motion, and defense counsel filed a motion to withdraw, averring that he had not been retained for appellate purposes. The trial court denied Appellant's post-sentence motion and granted counsel's request to withdraw on January 18, 2023. No further action was taken at that time.

Appellant filed a *pro se* notice of appeal[2] and petition for appointment of counsel on April 21, 2023. The trial court treated the pleading as a petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46, appointed counsel and granted PCRA counsel 60 days to file an amended PCRA petition. After a brief extension of time, Appellant filed an amended PCRA petition on February 2, 2024, requesting reinstatement of his direct appeal rights. The Commonwealth had no objection to that request, and the trial court reinstated Appellant's direct

---

[2] The *pro se* appeal was discontinued on June 26, 2023.

appeal rights on February 29, 2024. This appeal followed. Appellant raises two issues for our review:

1. Was the evidence presented by the Commonwealth insufficient to prove beyond a reasonable doubt that [Appellant] committed the offense of drug delivery resulting in death where the Commonwealth failed to prove that [the] drugs which [Appellant] delivered to Ms. Zimmerman, were the drugs that Ms. Zimmerman ingested and caused Ms. Zimmerman's death?

2. The trial court erred in charging the jury on the crimes of delivery of a controlled substance and criminal conspiracy to deliver a controlled substance as lesser included offenses when [Appellant] did not request the charges to be submitted to the jury for its consideration.

Appellant's Brief, at 11.

Our standard of review when faced with a challenge to the sufficiency of the evidence is:

whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Brown***, 23 A.3d 544, 559-60 (Pa. Super. 2011) (*en banc*) (citations omitted).

The crime of DDRD is committed when a "person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance . . . in violation of section 13(a)(14) or (30) of the . . . Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance." 18 Pa.C.S.A. § 2506(a). Section 2506 "consists of two principal elements: (i) intentionally administering, dispensing, delivering, giving, prescribing, selling, or distributing any controlled substance or counterfeit controlled substance, and (ii) death caused by ('resulting from') the use of that drug." ***Commonwealth v. Kakhankham***, 132 A.3d 986, 991-92 (Pa. Super. 2015), *appeal denied*, 138 A.3d 4 (Pa. 2016). "The statute, therefore, . . . requires a 'but-for' test of causation." ***Id.*** at 993. The applicable *mens rea* required is two-fold:

> First, the delivery, distribution or sale of the contraband must be intentional. Second, the actual death must be the reckless[3] result

---

[3] The **Kakhankham** Court was tasked with determining the *mens rea* for the second element of DDRD. **Kakhankham**, 132 A.3d at 993. The Court rejected the argument that the second element requires the same *mens rea* as the first element (intentionally) because the "intentionally causing the death of another person is already criminalized (*i.e.*, first degree murder)." ***Id.*** It also rejected the argument that the legislature intended not to subject the second element to any *mens rea* and instead impose absolute liability. ***Id.*** at 994-95. Thus, the Court concluded that the *mens rea* for the second element must be at least reckless because (1) Section 2506 does not regulate conduct that is the subject of the typical public welfare offense for which the legislature imposes absolute criminal liability; (2) the purpose of the statute
*(Footnote Continued Next Page)*

> of the actions of the defendant. As such, the crime is an intentional act in providing contraband, with a reckless disregard of death from the use of the contraband.

*Commonwealth v. Carr*, 227 A.3d 11, 16-17 (Pa. Super. 2020). This Court has held that the Commonwealth "satisfies the reckless element as to the possibility of death" for the purpose of DDRD when the substance involved is heroin or fentanyl. *See Commonwealth v. Scott*, 325 A.3d 844, 850 (Pa. Super. 2024); *see also Kakhankham*, 132 A.3d at 995-96.

Here, Appellant does not challenge whether he sold a controlled substance to Zimmerman. Instead, Appellant argues that the evidence failed to satisfy the second element, *i.e.*, that the drugs he sold to Zimmerman caused her death. Appellant's Brief, at 31. He provides several reasons for this contention: (1) none of the drug paraphernalia in the motel room were tested for controlled substances; (2) Zimmerman could have sold the drugs she obtained from Alvarez and Appellant without ingesting them; and (3) Zimmerman could have purchased additional drugs from someone other than Appellant and Alvarez, as two or three people were seen going in and out of Zimmerman's motel room after she returned from the Econo Lodge. *Id.* at 27-31. Therefore, Appellant asserts, the jury was left to speculate whether the drugs Appellant delivered to Zimmerman caused her death. *Id.* at 29.

In *Kakhankham*, the appellant similarly argued that the Commonwealth failed to prove that heroin he sold to the victim was the sole

---

is to criminalize conduct not otherwise covered by the Crimes Code; (3) the penalty for the offense is serious; and (4) the common law origin of the crime involved (homicide) traditionally has a *mens rea* requirement. *Id.* at 995.

or primary cause of the victim's death. ***Kakhankham***, 132 A.3d at 993 n.8. The ***Kakhankham*** court explained, however, that even if the victim's death resulted in part from causes other than the defendant's conduct, he could still be held criminally liable:

> Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other facts combined with that conduct to achieve the result.

***Id.*** Moreover, courts have held that "so long as the defendant's conduct started the chain of causation which led to the victim's death, criminal responsibility for the crime of homicide may be properly found." ***Commonwealth v. Keogh***, 2023 WL 118687 at *6 (Pa. Super. filed Jan. 6, 2023) (unpublished memorandum) (citations and quotation marks omitted).[4] A defendant may be criminally liable for another's death even where the defendant's conduct is not the "sole or immediate cause." ***Id.***

Here, viewing the evidence in the light most favorable to the Commonwealth, we conclude that there was sufficient evidence to support Appellant's DDRD conviction. The evidence shows that Zimmerman and Alvarez exchanged several messages setting up the purchase of fentanyl, including Zimmerman sending money to Appellant's Cash App account.

---

[4] ***See*** Pa.R.A.P. 126(b) (unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

Appellant and Alvarez drove to Philadelphia to procure the fentanyl for Zimmerman, as well as other drugs for their personal use. When Appellant and Alvarez returned to Econo Lodge, Zimmerman walked a mile to pick up the fentanyl. Zimmerman and Appellant then exchanged messages to arrange for delivery, a fact which was corroborated by video evidence.

The toxicology report showed the presence of fentanyl, methamphetamine, THC, and their related by-products (metabolites) in Zimmerman's system. N.T. Trial, 10/11-13/2022, at 128. Methamphetamine was detected at 600 nanograms per milliliter. *Id.* at 132. Amphetamine, the metabolite of methamphetamine, was detected at 54 nanograms per milliliter. *Id.* at 132-33. Dr. Ross explained that the typical level of methamphetamine to cause death is 1,000 nanograms per milliliter, but in some cases can be lower than 1,000 nanograms per milliliter, and up to 18,000 nanograms per milliliter. *Id.* at 133. Zimmerman was a known user of methamphetamine; therefore, Dr. Ross opined that the level of methamphetamine and amphetamine, as well as the level of THC and its metabolites, in Zimmerman's blood were not contributing factors to her death. *Id.*

Fentanyl was detected at 9.1 nanograms per milliliter. *Id.* at 132. Norfentanyl, the metabolite of fentanyl, was detected at 2.6 nanograms per milliliter. *Id.* The lethal level of fentanyl is typically three nanograms per milliliter. *Id.* at 118. Zimmerman's blood contained three times that amount.

*Id.* at 132. After evaluating these figures, Dr. Ross opined that Zimmerman's death was caused by acute fentanyl toxicity. *Id.* at 130.

Although Detective Jones recovered messages of Zimmerman showing that she had attempted to buy drugs from individuals other than Appellant and Alvarez, there was no evidence that she actually did so. *Id.* at 277-78. For example, in one such message thread, Zimmerman stated that she did not have the money to purchase drugs and would have to be "fronted," them, *i.e.*, given on a loan. *Id.* at 278. She never met that person. *Id.*

The jury also heard testimony that Zimmerman had requested an additional seven bags of fentanyl for her to sell from Appellant and Alvarez. *Id.* at 170, 173. Zimmerman's last message to Appellant indicated her intent to ingest the fentanyl that she just purchased and to sell a portion as well:

> Yo, these bags are small as shit. That's crazy. Dude, I didn't expect you guys to do me wrong like this. I know how Philly bags are. They are big enough to take some out and still have a good bag to sell. Come on now, like, I kind of want my money back. I look out for you guys when I can.

*Id.* at 254. Thus, even if Zimmerman sold some of the drugs she received from Appellant, she also intended to use them herself, and her toxicology results show that she did in fact ingest a lethal amount of the drug.

Appellant has argued that it was possible that Zimmerman did not overdose from the drugs he sold her, as the jury heard testimony that two to three other individuals went in and out of Room 33 between February 19-20, 2021. However, the Commonwealth does not need to preclude every possibility of innocence, and any doubts regarding a defendant's guilt may be

resolved by the jury, which is free to believe all, part, or none of the evidence. *See Brown*, 23 A.3d at 559-60. Appellant could therefore be found guilty as long as there was evidence showing that his conduct was a direct and substantial factor in her death. Even if the jury believed that she purchased and ingested drugs from another individual, Appellant's conduct in selling Zimmerman fentanyl (which he knew to be intended at least in part for her personal use) was sufficient evidence to establish his commission of the offense beyond a reasonable doubt. Accordingly, as to Appellant's sufficiency claim on his DDRD conviction, no relief is due.

In Appellant's second issue, he asserts that the trial court erred by adding the lesser-included offenses of delivery of a controlled substance and conspiracy to deliver a controlled substance to the verdict slip. We find this issue waived for lack of development in the appellate brief. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (finding a claim waived "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review"). "[A]n issue identified on appeal but not developed in the appellant's brief is abandoned, and therefore, waived." *Commonwealth v. Felder*, 247 A.3d 14, 20 (Pa. Super. 2021). Here, while Appellant raised a claim regarding the inclusion of lesser-included offenses in the jury charge, he included no discussion or argument on the issue in his brief. Therefore, Appellant has waived this issue, and we need not consider its merits.

Judgment of sentence affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 06/27/2025